[Crim. No. 11889. In Bank. Mar. 13, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM
ARCHIE FAIN, Defendant and Appellant.

Robert Y. Bell, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Charles P. Just, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—Defendant William Archie Fain appeals from a judgment entered upon jury verdicts convicting him of first degree murder (Pen. Code, § 187), three counts of forcible rape (Pen. Code, § 261),[1] one count of forcible sex perversion (Pen. Code, § 288a), two counts of kidnaping (Pen. Code, § 207), and one count of attempted kidnaping (Pen. Code, §§ 663, 207). In the penalty proceeding the same jury fixed the punishment at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment as to guilt but, under compulsion of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], we reverse as to penalty.

At dusk on June 19, 1967, high school students gathered in Dorado Park in Oakdale to sign each other's yearbooks. About 9 p.m. a classmate took Diana and Cathy to Diana's house, and a short time later another friend took the girls to the outskirts of town where they joined other classmates for a party. About midnight the girls resolved to return to Diana's house, where Cathy was to spend the night, and Mark Ulrich volunteered to drive them into town. The three were proceeding toward town when a car, its lights blinking on and off, approached Mark's car from the rear. Believing a friend Jim, who had attended the party, was behind him and signaling for him to stop, Mark pulled over on the shoulder of the road, stepped out of his car, and walked toward the other car, which had halted immediately behind his own. The driver of the other car, a stranger to Mark, likewise got out of his car, walked toward Mark, and killed him with a shotgun blast fired at short range.

The stranger then ordered the two girls out of Mark's car

---

[1]Of the three counts of forcible rape, two were charged under section 261, subdivision 4, and one under section 261, subdivision 3.

and into his, and after driving the girls around the country-side for some time stopped in a remote field away from town. At gunpoint he ordered the girls to disrobe. Cathy asked him what he planned to do and he replied, "What do you think?" He first assaulted Cathy and then Diana; in both cases he accomplished penetration, and also effected an act of oral copulation on Diana. After the assaults, he told the girls to dress, and admonished them not to forget anything, mentioning in particular their shoes. He allowed the girls to go but warned them, if they looked back, he would kill them. About 2:15 a.m., and more than six miles from the point of their release, the girls arrived at a farmhouse and summoned the police.

Two passing motorists discovered Mark's body within minutes of the time he was shot; one had two-way radio equipment, and he notified the Oakdale police and called for an ambulance. The roadside commotion had already aroused the interest of Harvey Magers, a high school student, who had been sitting in his car, waiting for his brother to return home. He had observed two cars proceed rapidly down the road. as though they were racing, with the rear car blinking its lights. He watched the two cars stop, heard a "popping noise," heard one car dash off, and, as it passed near him, noted it was a whitish 1959 Ford. Shortly thereafter he saw the two motorists stop, his brother also stop, and the police and ambulance arrive. At this point Harvey realized something serious had occurred, went to the scene, less than a quarter mile from where he had been waiting, and related his observations to the police.

About 2:30 a.m. Officer Jones spotted a light 1959 Ford parked in front of 310 East "D" Street in Oakdale, just half a block from the police station. He shined his flashlight into the car. and noticed an expended shotgun shell lying on the floor. Upon reporting this finding he was instructed to keep the vehicle under surveillance. As the investigation unfurled. officers developed further information strengthening their belief that the Ford was the vehicle involved in Mark's death, and learned that it belonged to defendant.

About 4:30 a.m. Sergeant Johnson returned to Oakdale with the girls. Officers then prepared to arrest defendant. As four officers went to the front door at 310 East "D" Street, others surrounded the house. Sergeant Hall knocked on the door and, in response to an inquiry from within, informed the occupant it was "the Sheriff's Department, please come to the

door.'' A woman came to the door, the officers identified themselves, and requested permission to enter. The woman, the wife of defendant's cousin, gave her permission, whereupon the officers made a quick search of the house. Sergeant Johnson located defendant asleep on a sleeping porch toward the back of the house; he placed his revolver against defendant's head and said, ''Sheriff's Office, don't move.'' Sergeant Hall then asked if he was William Archie Fain, and defendant said ''yes.'' He next asked, ''Where is the gun?'' and defendant replied, ''under the couch.'' After removing the shotgun, Sergeant Hall formally advised defendant he was under arrest.

At trial the People developed a compelling case against defendant on the accusations growing out of the events on the night of June 19. In his own defense defendant claimed he was otherwise occupied on the night in question. No witnesses substantiated his alibi, however, and it could not withstand the crushing force of the People's presentation. Since defendant does not dispute the sufficiency of the evidence, we limit our discussion to a few examples illustrating the nature of the evidence against defendant.

In the course of the investigation officers found expended and unexpended shotgun shells in defendant's car, unexpended shells in his pants, and expended shells in the field where Cathy and Diana were assaulted. David Q. Burd, a criminologist with the state Bureau of Criminal Investigation and Identification, conducted extensive tests with defendant's shotgun, and the tests showed, beyond any doubt in his professional judgment, that the expended shells found in the field had been fired by defendant's shotgun. Pellets removed from Mark's body were of the same kind as those in the shells in defendant's possession; in addition, a piece of plastic wadding found at the site of the killing was, according to Mr. Burd, from the same type of shell. Diana recalled, once inside the police station, that her assailant wore a necklace, subsequently found in defendant's room under his mattress. Diana had also left a beach towel in the Ford, and both girls remembered seeing a loose pair of shoes in the back of the car; investigating officers found both the towel and shoes similar in appearance in defendant's car. Finally, both girls identified defendant and his car in court.

Defendant was also convicted of raping a Mrs. Hayes and attempting to kidnap a Mrs. Workman. Again, defendant does not here assert that the evidence is insufficient on either count, and hence we do not set forth the record in minute detail.

About 1:15 a.m. on June 16, four days before Mark was killed, Mrs. Hayes was driving toward Riverbank, a small community not far from Oakdale, when her car ran out of gas. As she pondered her predicament, defendant stopped and asked if she needed assistance. She accepted his offer of a ride into town; instead of driving into Riverbank, as she expected, defendant soon left the highway, turned onto a secondary road, and then into a field. When she resisted his sexual advances, he threatened to kill her; he overcame her resistance, and achieved penetration. Following the assault, defendant drove her toward Riverbank; when he came to a stop at an intersection, she escaped. She left some of her clothes, including her shoes, in the car. She walked into a police station but, at that time, declined to report the crime out of concern for the embarrassing effect any publicity might have on her children. After Mark's death, she saw defendant's picture in the local paper, consulted with her husband, and decided her duty as a citizen required her to report the incident. She had spent about an hour in defendant's presence, and identified him in court.

The incident involving Mrs. Workman occurred several days earlier. Just past midnight on June 9, she was driving home upon completion of her factory shift. She and a neighbor, who worked on the same shift, customarily followed each other home. This precaution was adopted that night, although Mrs. Workman had a considerable lead. A car previously observed by her suddenly came upon her, dimmed and shined its lights, and attempted to force her off the road. A man later identified as this defendant succeeded in bringing her to a stop, got out of his car with pistol in hand, and ordered her out of her car, threatening to kill her if she did not. Knowing her neighbor would soon appear, Mrs. Workman did not heed defendant's command. When the headlights on her neighbor's car came into view, defendant drove off at a high rate of speed. Mrs. Workman immediately reported the incident to the sheriff's office. She had a clear view of defendant in the light of the headlamps, remembered certain distinguishing features about his car, and identified him in court.

On each of these last two counts, defendant testified he was in bed by 11 p.m. on the nights in question. His account of his activities on each day was subjected to devastating impeachment, however, and it is hardly a matter of surprise that the jury disbelieved him.

Defendant complains that the trial court should have

severed the two counts involving Mrs. Hayes and Mrs. Work-man from the other counts involving the night of June 19. Trial counsel, however, did not move for such a severance, and we have said that in the absence of a proper motion defendant cannot raise the issue on appeal. (*People* v. *Kemp* (1961) 55 Cal.2d 458, 473-477 [11 Cal.Rptr. 361, 359 P.2d 913].)

Defendant's principal contentions on appeal relate to jury instructions. In several instances he challenges the instructions as given; he also argues that the court should have given two additional instructions. We review defendant's contentions below and conclude they lack merit.

■ Defendant first maintains that the court's instruction on the effect, if shown, of intoxication was "misleading and contradictory." The instruction, set forth in the margin, combines CALJIC No. 319 (revised) and CALJIC No. 305.1 (new).[2]

There is but the most fragmentary evidence of intoxication. On the evening of Mark's death defendant said he had two beers with his cousin and then, as part of his alibi, claimed he had several more beers at a local tavern. The arresting officers noticed no signs of intoxication, however, and both girls testified that defendant did not smell of alcohol. On the counts involving Mrs. Workman and Mrs. Hayes defendant did not introduce any evidence of intoxication.

Defendant argues that the first paragraph of the instruc-

[2] "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.

"If and when the proof shows that the defendant unlawfully killed a human being, and if the evidence also shows that at the time of the mortal assault the defendant was intoxicated, the jury is permitted and ought to consider such evidence of intoxication for the purpose of determining the intent with which the act was done.

"If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree."

tion cannot stand because it contains language in effect condemned by our decisions in *People* v. *Ford* (1964) 60 Cal.2d 772, 796-797 [36 Cal.Rptr. 620, 388 P.2d 892], and *People* v. *Spencer* (1963) 60 Cal.2d 64, 86-89 [31 Cal.Rptr. 782, 383 P.2d 134]. The first paragraph is a verbatim repetition of section 22 of the Penal Code. Defendant's specific objection relates to the first sentence, ''No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.'' As we noted in *Spencer* and again in *Ford*, such language, when the prosecution must prove specific intent, ''could well leave a jury in a state of confusion or even with the impression that as a matter of law a defendant's voluntary intoxication can have no effect on the criminality of his conduct.'' (*People* v. *Spencer, supra,* at p. 87; see *People* v. *Ford, supra,* at pp. 796-797.) But we need not decide whether CALJIC No. 319, as revised, constitutes a sufficient cure, since in this case no prejudice could have resulted. Neither the arresting officers nor the girls smelled alcohol on defendant's breath; defendant's self-serving declarations are therefore the only evidence of intoxication. His showing in this regard is considerably less compelling than the inadequate showing made in *Spencer,* in which a serious error in instruction on intoxication was held nonprejudicial. Under these circumstances error, if any, in the questioned instruction must be deemed nonprejudicial.

Defendant next predicates error on the omission from the trial court's instructions of CALJIC No. 303-A (new).[3] This instruction, entitled ''Diminished Capacity to Premeditate,'' is based on *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959]. Unlike the situation in *Wolff,* however, defendant did not present evidence of mental illness during the guilt phase. His defense, we repeat, was that of alibi, not diminished capacity. In this case the diminished capacity instruction given by the court (CALJIC No. 305.1 (new)) fully informed the jury to the extent permitted by the evidence.[4] While defendant asserts that the trial court

---

[3]CALJIC No. 303-A reads: ''Before you may find the defendant guilty of wilful, deliberate and premeditated murder of the first degree, you must determine that at the time the crime allegedly was committed he not only had sufficient mental capacity to form the specific intent to kill but also had sufficient mental capacity to maturely and meaningfully deliberate, premeditate and reflect upon the gravity of his contemplated act and to harbor malice aforethought.''

[4]CALJIC No. 305.1 (new), except for deletion of the words ''mental illness,'' appears as the third paragraph in footnote 2, *ante.*

should not have stricken the words "mental illness" in CALJIC No. 305.1 (new), no purpose would have been served by their inclusion, since not a scintilla of evidence introduced during the guilt phase raised such a defense.

▮ Defendant also argues that the trial court committed prejudicial error in its instruction on the felony second degree murder rule. The trial court delivered CALJIC No. 305 (revised), the standard second degree murder instruction, which we set forth in the margin.[5] Defendant maintains that the felony second degree murder rule has no application if the felony resulting in homicide is assault with a deadly weapon. In *People* v. *Ireland* (1969) *ante,* pp. 522, 539 [75 Cal. Rptr. 188, 450 P.2d 580], we so stated, and observed that in the circumstances of that case such an instruction "would have substantially eviscerated the defense, which was based upon principles of diminished capacity." By contrast, no prejudice appears in the case at bar, in which the sole defense was alibi.

▮ Defendant next alleges that, in its instruction on first degree murder, the trial court erred in stating that the crime of murder does not always require an intent to kill. The court informed the jury, however, that no intent to kill was required if malice aforethought, express or implied, was shown or if the homicide occurred during the commission of a felony. Under the People's theory of the case defendant killed Mark to effectuate his preexisting intent to rape the girls. If evidence in the record supports that theory, the court was correct in its instruction that an intent to kill was not necessary. (*People* v. *Washington* (1965) 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Ford* (1964) *supra,* 60 Cal.2d 772, 795.)

---

[5]"Murder of the second degree is the unlawful killing of a human being with malice aforethought which is not perpetrated by means of a wilful, deliberate, and premeditated killing, and which is not committed in the perpetration or attempt to perpetrate rape, or any act punishable under Section 288 of the Penal Code.

"In practical application this means that the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases:

"(1) When there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish wilfulness, deliberation and premeditation, or

"(2) When the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial motive and with wanton disregard for human life, or

"(3) When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, *such as assault with a deadly weapon.*" (Italics added.)

But defendant claims that no evidence suggests he harbored any preexisting intent. The record indicates otherwise. It readily can be inferred that defendant stopped Mark's car because he saw female occupants. The sole obstacle in his path was the male occupant, whom he immediately killed. He swiftly abducted the girls at gunpoint, drove them to a remote place, and raped them. The jury could justifiably infer he had already formulated an intent to rape before he stopped Mark's car. (See *People* v. *Cheary* (1957) 48 Cal.2d 301, 310 [309 P.2d 431].)

■ Defendant correctly points out that the requisite intent under a felony-murder rape theory is specific intent to commit rape. "Under the felony-murder doctrine, the intent required for a conviction of murder is imported from the specific intent to commit the concomitant felony." (*People* v. *Sears* (1965) 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938]; see also *People* v. *Cheary* (1957) *supra,* 48 Cal.2d 301, 310.) ■ He asserts prejudicial error in the trial court's failure to instruct the jury on the necessity of finding a preexisting specific intent to commit rape. While the trial court should have so instructed the jury in connection with its felony-murder instruction, we perceive no prejudice. Again, the nature of the defense assumes critical importance. Had defendant asserted intoxication or mental illness as a defense, omission of a specific intent instruction might well have been prejudicial, since there could be no assurance that the jury, choosing to rely on the felony-murder rule, concluded he had more than a general intent. In the absence of any probative evidence of intoxication or mental illness, however, and in view of the uncontradicted state of the record pointing to the assailant's unmistakable intent to commit rape, it is not reasonably probable that a result more favorable to defendant would have been reached under exemplary instruction. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Defendant contends that the trial court should have given a manslaughter instruction on its own motion. He relies on *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]. In *Conley,* despite substantial evidence of intoxication, the trial court declined to give a manslaughter instruction, necessitating reversal by this court. By contrast, the evidence here did not justify a manslaughter instruction. Trial counsel did not request such an instruction, and the minimal evidence of intoxication was plainly insufficient to

impose on the trial court a duty to give, *sua sponte,* a manslaughter instruction.

 Defendant's remaining specification of error on the instructions relates to the phrase, "malice aforethought." In his view "malice aforethought" adds up to "legal jargon," and its inclusion in the murder instructions constitutes prejudicial error. We do not pause for lengthy consideration of this point, however, since the expression has a well-settled place in our law. (See *People* v. *Conley* (1966) *supra,* 64 Cal.2d 310, 324 fn. 4.)[6]

 Defendant next challenges the competency of his trial counsel. The very transparency of the alibi testimony, the defendant now asserts with the clarity of hindsight, indicates that an alibi defense should have been abandoned. Specifically, defendant charges that the defense should have been centered on diminished capacity, not alibi. It is noteworthy that defendant initially entered a plea of not guilty by reason of insanity; before trial, he withdrew the insanity plea in favor of a not guilty plea. Pretrial psychiatric reports, defendant concedes, revealed the possible presence of a diminished capacity defense. The fact that an insanity plea was entered suggests that a defense structured on defendant's inability to reach the requisite mental state did receive consideration, but counsel ultimately rejected dependence upon that defense. We cannot conjecture, of course, on the reason for this decision. In presenting the defense of alibi, counsel vigorously cross-examined prosecution witnesses, called witnesses on his client's behalf, put defendant on the stand to testify under oath concerning his alibi, and extensively summarized the defense in arguments to the jury. Defendant cannot now be heard to complain because his chosen defense was not successful and his sworn testimony disbelieved. (*People* v. *Reeves* (1966) 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].)

 Defendant also finds a second indication of incompetence in his counsel's failure to object to certain testimony. Without objection Sergeant Hall testified that, in response to a question by him concerning the location of the gun, defendant replied it was "under the couch." On its own initiative the trial court questioned counsel about the statement's admissibility, with particular reference to *Miranda* v. *Arizona*

---

[6]Admittedly much legal argot would have difficulty in withstanding the microscopic examination of semanticists. (See Mellinkoff, The Language of the Law (1963) 17, 21.)

.(1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974], since the officers had not yet apprised defendant of his constitutional rights. Defense counsel voiced no objection, however;[7] in his own testimony defendant explained his response was natural and rational: with children in the house, he required a secure place to store the weapon, and he did in fact keep his gun under the couch. Under these circumstances defense counsel's action can only be deemed a not unreasonable aspect of trial strategy.

We need not consider defendant's other allegations of trial counsel inadequacy, such as failure to seek a venue change or to present a motion for a new trial; in each instance he makes no showing he suffered a constitutional deprivation of the assistance of counsel. Nor did any asserted lack of diligence or competence by counsel reduce the trial to a farce or a sham. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

Under the rule of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], we have concluded, however, that defendant must be accorded a new penalty trial.

Just two veniremen expressed reservations about capital punishment. One prospective juror emphatically stated that her views would preclude her from returning ·a first degree murder conviction, and she was properly excused for cause. The second, examined at length by the court and counsel, stated that it would be difficult for her to vote for the death penalty but also said she could subordinate her private beliefs about capital punishment to her duty as a juror. Before excusing her for cause, the trial judge described her position as follows: ''Well, frankly, I wouldn't know how to summarize what your attitude is. I think you have not formed any conscientious opinion, but very definitely you do not favor the death penalty.'' The venireman agreed with this statement of her views.

The attitude of this venireman is not dissimilar to one described in an illustrative example in *Witherspoon*: ''Only one venireman who admitted to 'a religious or conscientious scruple against the infliction of the death penalty in a proper case' was examined at any length. She was asked: 'You don't

---

[7]We express no opinion on the statement's admissibility; by failing to object, defendant has waived any right to raise the issue on appeal. (*People v. Castro* (1968) 257 Cal.App.2d 643, 645-646 [65 Cal.Rptr. 62]; cf. *People* v. *Doherty* (1967) 67 Cal.2d 9, 14-15 [59 Cal.Rptr. 857, 429 P.2d 177].)

believe in the death penalty?' She replied: 'No. It's just I wouldn't want to be responsible.' The judge admonished her not to forget her 'duty as a citizen' and again asked her whether she had 'a religious or conscientious scruple' against capital punishment. This time, she replied in the negative. Moments later, however, she repeated that she would not 'like to be responsible for . . . deciding somebody should be put to death.' Evidently satisfied that this elaboration of the prospective juror's views disqualified her under the Illinois statute, the judge told her to 'step aside.' '' (391 U.S. at p. 515 [20 L.Ed.2d at p. 781].)

In disapproving the venireman's dismissal for cause, the United States Supreme Court explained: ''As the *voir dire* examination of this venireman illustrates, it cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see *People* v. *Bandhauer,* 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 337, 426 P.2d 900, 905]) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him.'' (*Id.* at pp. 515-516, fn. 9 [20 L.Ed.2d at pp. 781-782].)

In the instant case dismissal for cause of the second venireman does not meet the standard enunciated in *Witherspoon,* for the record does not show she would never have voted for infliction of a capital penalty. ''Unless a venireman states *unambiguously* that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.'' (Italics added.) (*Ibid.*) While the second venireman readily admitted that a decision to impose the death penalty would be ''hard'' for her, she also expressed a willingness to consider that penalty. She should not have been excluded for cause simply because she made known a strong distaste at the prospect of imposing a death sentence. (See *People* v. *Bradford* (1969) *ante,* pp. 333, 346-347 [74 Cal. Rptr. 726, 450 P.2d 46].)

Since this case must be remanded to the Superior Court of Stanislaus County for a second penalty trial, we discuss briefly the proper disposition of a serious problem we have brought to the attention of counsel. As prospective veniremen are called to service in Stanislaus County, they must complete a ''Prospective Juror Affidavit'' prepared by the jury commissioner. Persons qualifying for service are then assigned to a master jury panel in the superior, municipal, or

justice court. Question 20 of the affidavit requests prospective jurors to answer "yes" or "no" to the question, "Do you believe in capital punishment?"

We cannot conceive of, nor could counsel suggest, any valid use to which this information could be applied. The record does not disclose whether persons answering in the negative are more likely to be assigned to the master jury panel for the municipal or justice court instead of the panel for the superior court. If such pre-screening in fact occurs, the venire from which jurors in capital cases are selected would not comport with *Witherspoon*. Thus, if defendant requests an evidentiary hearing on the purpose and effect of Question 20, the People must show that no pre-screening in fact exists. Because proper adjudication requires testimony of official witnesses and production of official documents, the People assume the burden of demonstrating that present practice satisfies constitutional requirements. In the event the People do not prevail, the jury commissioner must assemble a new venire of jurors whose views on capital punishment have not been solicited prior to *voir dire* examination in court.

The judgment is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment both as to the guilt and penalty.

Appellant's petition for a rehearing was denied April 9, 1969, and the opinion was modified to read as printed above.