[Crim. No. 7352.   First Dist., Div. Two.   May 23, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CLARENCE
PAUL MAHLE, JR., Defendant and Appellant.

R. Corbin Houchins, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and James

B. Cuneo, Deputy Attorneys General, for Plaintiff and Respondent.

TAYLOR, J.—Defendant, Clarence P. Mahle, appeals from a judgment of conviction entered on a jury verdict, finding him guilty of the second degree murder of his wife. He contends that the judgment of conviction must be reversed as: 1) the jury was erroneously instructed on the felony-murder rule, and on implied malice; 2) the court failed to instruct the jury, *sua sponte*, on involuntary intoxication; 3) he was deprived of his right to fully cross-examine a key eyewitness; 4) the prosecution was guilty of prejudicial misconduct; and 5) he was deprived of the effective aid of counsel during the trial.

As we have concluded, for the reasons set forth below, that the judgment must be reversed, a very brief summary of the pertinent facts will suffice. About 1:20 a.m. on September 20, 1967, Officers Hazen and Esparaza of the San Jose police received a radio report of a stabbing and possible homicide at a nearby apartment building. Officer Esparaza was directed to apartment 23, where he found Shirley Mahle, lying on the floor, conscious, but unable to talk, and gasping for breath. Shortly thereafter, Shirley died in the hospital from a large stab wound in her heart.

As Officer Hazen passed the open front door of apartment 21, someone said: "In here." Hazen entered and saw defendant, who was sitting in a chair. When asked what happened, defendant replied: "I did it and I'm very sorry." Hazen arrested defendant for assault with a deadly weapon and handcuffed him. In the kitchen of apartment 21, the officer found a hunting knife next to the blood-smeared sink. The refrigerator contained a bottle of vermouth and a quart bottle of gin, both nearly empty.

About one week before the homicide, Shirley's sister, Ella Mae Iverson, with her son and a friend, Karen Eves, with her little girl, arrived from Detroit and stayed with defendant and Shirley in apartment 21, while Mrs. Iverson looked for an apartment. On the evening in question, Mrs. Iverson had observed defendant drinking martinis and watching television. About 10:30 p.m., everyone went to bed. Defendant and Shirley occupied one bedroom; Mrs. Iverson, her son and the three Mahle children occupied the second bedroom, while Mrs. Eves slept in the living room.

About midnight, Mrs. Iverson and Mrs. Eves were awakened by defendant's shouts from the kitchen demanding that

Shirley get out of bed immediately and defrost the refrigerator. When Shirley refused, defendant threw a package of frozen meat out the window and returned to his bedroom. Mrs. Iverson then heard a thud, after which Shirley ran into Mrs. Iverson's bedroom screaming, and closed the door. Defendant attempted to enter the bedroom occupied by Mrs. Iverson but was rebuffed. Shirley then left the bedroom and the fighting resumed; on one occasion, defendant attempted to strike Shirley with a belt. When Shirley asked Mrs. Eves to call the police, defendant indicated that he would calm down and make no more trouble.

Thereafter, Mrs. Iverson heard more screaming and fighting, with Shirley shouting: "Leave me alone." Again, the battle progressed to Mrs. Iverson's bedroom and again defendant ceased his attack and left Mrs. Iverson's bedroom, stating he would make no more trouble. Mrs. Iverson further testified that shortly after Shirley left her bedroom, she heard the sound of a scuffle in the hall and that Shirley again ran into Mrs. Iverson's bedroom, staggering and saying: "He stabbed me in the heart" and that defendant was standing in the hall with a bloody hunting knife that belonged to Mrs. Iverson and said: "I got her. I got her good this time."

Defendant testified that on the afternoon preceding the homicide, he arrived home about 5 p.m. He had taken two Librium tranquilizers early in the afternoon because he was nervous and had a beer, another Librium capsule and a martini about 6:30 p.m. Throughout the evening, he intermittently repaired Mrs. Iverson's phonograph, watched television and drank martinis. He did not recall how much he had been drinking or going to bed. He did remember having intercourse with his wife, who became annoyed with him because he was unable to achieve orgasm. His wife accused him of being sexually interested in Mrs. Eves and an argument ensued. The next thing he remembered was standing in the living room with the bloody knife. He denied any recollection of the various phases of the fight with his wife in the bedrooms. He recalled that he threw the bloody knife into the kitchen, dressed, combed his hair, sat in the living room, smoked a cigarette, and waited for the police. He also recalled that the sight of the bloody knife had sobered him up enough to remember the conversation with the police.

Dr. Peschau, an Agnews State Hospital psychiatrist, interviewed defendant for two hours on November 21, 1967, about two months after the killing. On the basis of the interview, his review of the police reports, and the statements of the eyewit-

nesses, the doctor concluded that at the time of the homicide, defendant was in a state of toxic amnesia, as he had been consuming about a quart of alcohol per day for six days prior to the homicide and had been taking the Librium every four hours. Dr. Peschau concluded that defendant was unable to premeditate or form an intent to harm his wife, had acted impulsively, and was not able to remember the homicide. Defendant manifested no evidence of organic brain damage and was not insane.

A blood sample taken from defendant shortly after his arrest indicated an alcoholic content of .19 percent. The prosecution's chemist testified that an individual may experience various impairments at various stages of intoxication and that two of the gross signs of intoxication were the impairment of the ability to walk or talk; that a person with a .19 percent blood alcoholic content would be considered to be under the influence of alcohol for the purpose of operating an automobile but that the effect of a given quantity of alcohol or an individual's ability to form an intent and carry out a given objective was beyond the scope of his training.

The officers who talked to defendant before and after the arrest smelled a slight odor of alcohol but did not observe anything about his behavior to indicate intoxication. Both Mrs. Iverson and Mrs. Eves, who had occasion to see defendant intoxicated at other times, testified that he did not appear intoxicated to them on the evening of the homicide.

■ Defendant first argues that it was error in the circumstances of the case to instruct the jury on second degree felony murder. The record indicates that the jury was given an instruction based on CALJIC No. 305 (Revised) (set forth below),[1] followed by an instruction upon the elements of the

---

[1] "Murder in the second degree is the unlawful killing of a human being with malice aforethought which is not a wilful, deliberate and premeditated killing.

"In practical application this means that the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases:

"(1) When there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish wilfulness, deliberation and premeditation, or

"(2) When the killing results from an act involving a high degree or probability that it will result in death, which act is done for a base, anti-social motive and with wanton disregard for human life, or

"(3) When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as Assault with a Deadly Weapon or by any means of force likely to produce death or great bodily injury."

crime of assault with a deadly weapon in terms of CALJIC No. 604. In *People* v. *Ireland*, 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580], decided in February of this year, our Supreme Court held that "a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged" (as modified April 9, 1969). The court's reasoning was set forth as follows at page 539: "This instruction might have been understood by the jury in either of two ways. First, the jury might have concluded therefrom that it should find defendant guilty of second degree murder if it *first* found that defendant harbored malice aforethought and *then* found that the homicide had occurred in the perpetration of the crime of assault with a deadly weapon. If the jury had understood the instruction in this way it would have misconceived the doctrine of second degree felony murder as we have explained it above. Second, if the jury derived from the instruction the correct meaning of the doctrine in question, it would have concluded that it should find defendant guilty of second degree murder if it found only that the homicide was committed in the perpetration of the crime of assault with a deadly weapon. This, the proper understanding of the instruction (see *People* v. *Phillips, supra,* 64 Cal.2d 574, 584, fn. 9 [51 Cal.Rptr. 225, 414 P.2d 353]), would have relieved the jury from a specific finding of malice aforethought."

The Supreme Court further said in footnote 13 of its opinion: "In the circumstances of the instant case this interpretation would have substantially eviscerated the defense, which was based upon principles of diminished capacity. Although specific intent to commit the underlying felony is necessary to the operation of the felony-murder doctrine (see *People* v. *Sears* (1965) 62 Cal.2d 737, 744 . . .) so that it is arguable that a defense of diminished capacity would not be entirely unavailable since it could be directed to the issue of intent to commit the underlying felony—nevertheless it is clear that the applicability of such evidence to that narrow issue would be in no way equivalent or comparable to the applicability of such evidence to the broad issue of malice aforethought in the charged offense. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 322. . . .)"

While the instant case was tried long before *People* v. *Ireland,* the reasoning and facts of that case are on all fours

with the instant one. Here, as in *Ireland, supra,* the entire defense was one of diminished capacity. Accordingly, the judgment must be reversed (*People v. Fain,* 70 Cal.2d 588, 598 [75 Cal.Rptr. 633, 451 P.2d 65]).

As we have concluded that the judgment must be reversed because of the error in the felony-murder instructions, we will discuss the remaining contentions on appeal only as they apply to errors to be avoided on retrial.

Defendant's contention concerning the instruction on implied malice will likewise be cured on retrial with proper instructions along the lines set forth in *Ireland, supra.* We note, however, that defendant's contention overlooks the fact that Penal Code section 188 expressly provides that malice may be implied as well as expressed and the instruction based thereon was proper.

Defendant next asserts that the trial court erred to his prejudice by failing to instruct the jury on the theory of involuntary intoxication, *sua sponte.*[2] He contends that the trial court should have explained to the jury the distinction between voluntary and involuntary intoxication and further indicate that involuntary intoxication producing unconsciousness would justify a verdict of acquittal. Defendant's argument is based on two alternative theories: first, that he was unaware of the potentially toxic effect produced by his ingestion of the drug Librium while drinking; and second, that his drinking was compulsive as a result of his alcoholic status.

For his first argument, defendant cites *People v. Murray,* 247 Cal.App.2d 730 [56 Cal.Rptr. 21]; *People v. Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]; and *People v. Corson,* 221 Cal.App.2d 579 [34 Cal.Rptr. 584], all of which are readily distinguishable: in *Murray,* the defendant had consumed both alcohol and goof-balls without knowledge of the possible effect of the combination; in *Conley,* there was evidence that the defendant had been taking drugs while consuming alcohol and that the drugs might have increased the effect of the alcohol, while in *Corson,* the intoxication was

---

[2]He specifically complains of the court's failure to give CALJIC Nos. 78-D and 78-E, which read as follows:

"78-D. (Revised) Intoxication of a person is voluntary if it results from his willing partaking of any intoxicating liquor, drug or other substance when he knows that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect as a possibility."

"78-E. (New) Intoxication is involuntary when it is produced in a person without his willing and knowing use of an intoxicant and without his willing assumption of the risk of possible intoxication."

allegedly induced by a combination of alcohol and drugs. Neither in *Conley* nor in *Murray* did the court discuss the necessity of *sua sponte* instructions on involuntary intoxication, and in *Corson*, the court did not find that the intoxication could be deemed involuntary.

In the instant case, there was uncontroverted evidence that defendant had been taking Librium for several months prior to the offense and had consumed large quantities of alcohol as well during this period. From this evidence, the jury could properly conclude that defendant would be well aware of the combination of alcohol and drugs. Furthermore, defendant here does not contend that the drugs were taken involuntarily but rather that the combined effect of the drugs and alcohol was unforeseen. In view of defendant's experience with the combined effects, the trial court properly determined that he was either aware thereof or willingly assumed the risk. This conclusion is supported by the evidence that on the evening of the homicide, defendant intentionally drank until he reached a condition of intoxication, as he had on several prior occasions.

Defendant's second argument, that because of his status as an alcoholic, his consumption of alcohol was compulsive and, therefore, involuntary, is not supported by the record. Defendant's psychiatrist testified that defendant drank to relieve his anxiety and sometimes drank to the point of unconsciousness, but did not classify defendant as an alcoholic or in any way indicate that his drinking was compulsive. To the contrary, the psychiatrist specifically testified that defendant's compulsion to drink was voluntary. ■ Voluntary intoxication, whether induced by liquor or drugs, is not a defense (*People* v. *Corson, supra,* p. 582). ■ We note that a somewhat similar contention to that made by defendant was specifically rejected by the U.S. Supreme Court in *Powell* v. *Texas,* 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145]. We conclude that under the evidence here adduced, the trial court was not required, *sua sponte,* to give any instructions on involuntary intoxication. However, on retrial, defendant may be able to adduce sufficient evidence to warrant such an instruction.

Although the matter has not been raised by defendant, the record indicates that the court here gave CALJIC Instruction No. 319 (Revised) (quoted in the footnote below).[3] In *People*

---

[3]"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of

v. *Fain*, 70 Cal.2d 588, 597 [75 Cal.Rptr. 633, 451 P.2d 65], our Supreme Court recently expressed grave doubts about the propriety of the first paragraph of the instruction, but held that under the particular circumstances of that case (the defendant's self-serving declarations were the only evidence of intoxication), no prejudice could have resulted. The court's criticism of the first paragraph of No. 319 was as follows, at page 597: "The first paragraph is a verbatim repetition of section 22 of the Penal Code. Defendant's specific objection relates to the first sentence, 'No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.' As we noted in *Spencer* and again in *Ford*, such language, when the prosecution must prove specific intent, 'could well leave a jury in a state of confusion or even with the impression that as a matter of law a defendant's voluntary intoxication can have no effect on the criminality of his conduct.' (*People* v. *Spencer, supra*, at p. 87 [60 Cal.2d 64 (31 Cal.Rptr. 782, 383 P.2d 134)]; see *People* v. *Ford, supra*, at pp. 796-797 [60 Cal.2d 772 (36 Cal.Rptr. 620, 388 P.2d 892)].)"

We think that under the particular circumstances of this case, on retrial, the first paragraph should be duly modified to remove the potential confusion. Here, the arresting officers smelled alcohol but did not consider defendant intoxicated, defendant had a fairly high blood alcohol content, and had been drinking for several hours prior to the homicide; the present wording of the first paragraph of the instruction might well be prejudicial under the guidelines set forth in *Fain, supra*.

▮ Defendant next argues that he was deprived of his right to a full and fair cross-examination of Mrs. Iverson, as the court rejected as irrelevant his offer of proof that exactly 18 months before the killing of Shirley, Mrs. Iverson's husband had been killed in a tavern brawl in Detroit and his killer subsequently acquitted. The record indicates that in

---

crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.

"If and when the proof shows that the defendant unlawfully killed a human being, and if the evidence also shows that at the time of the mortal assault the defendant was intoxicated, the jury is permitted and ought to consider such evidence of intoxication for the purpose of determining the intent with which the act was done.

"This rule applies to intoxication from any cause, whether by the use of drugs or otherwise, when voluntarily produced by the person later charged with crime."

response to the prosecution's question, Mrs. Iverson replied that defendant was not involved in the killing of her husband and that she had no particular feelings toward defendant as a result of the death of her husband. The trial court then rejected defendant's offer of proof on the ground that the testimony relating to the death of Mr. Iverson was irrelevant and provided no basis for establishing the bias or prejudice of the witness.

Defendant now contends that this ruling deprived him of an opportunity to show the great bias of Mrs. Iverson toward her husband's killer (although acquitted) as well as toward him and toward the judicial process, and would have supported an inference that she might exaggerate her testimony in order to assure his conviction for the killing of Shirley. He asserts that Mrs. Iverson's testimony that, immediately after the event, he said: "I got her good this time" is such an exaggeration. The latter contention, however, was not presented to the trial court and, therefore, cannot be raised for the first time on this appeal (Evid. Code, § 354, subd. (a)).

In any event, on retrial, the matter can be timely raised. As the only significant difference between the testimony of Mrs. Iverson and Mrs. Eves concerning the events prior to the homicide related to the above statement, defendant should be allowed to fully explore Mrs. Iverson's bias concerning the judicial system which is allegedly based on the violent death of her husband and *the acquittal of his killer*—an entirely different matter than the killing of her sister by defendant.

■ Defendant next contends that the prosecuting attorney was guilty of prejudicial misconduct. This contention is based on a reference in the prosecution's closing argument to another case in which a defendant, with a blood alcohol content of .32 percent, had been convicted of first degree murder. Immediately following this comment, defense counsel objected. The trial court found that the argument was a reasonable response to a portion of the defense argument, but ordered the reference to first degree murder in the light of a .32 percent blood alcohol level in the previous case stricken and instructed the jury to disregard the matter. Although the comment was clearly erroneous and properly stricken, the record indicates that the matter was not prejudicial. In any event, this error can likewise be avoided on retrial.

■ Finally, defendant contends that he was not adequately represented by trial counsel. The record indicates that throughout the trial, defendant was ably and well represented

by the public defender. Defendant's argument is based primarily on trial counsel's objection to the admission into evidence of a statement that defendant had made to the police without determining whether the statement was beneficial or detrimental to the defense. The record indicates that immediately after his arrest and again prior to his interrogation, defendant was advised of his rights and that his request to discuss the matter with an attorney was denied. When defense counsel informed the court that defendant had received medication prior to the interrogation, defense counsel's motion to exclude the statement to the police was granted. The record clearly indicates that defense counsel had examined the statement prior to the time it was offered in evidence and had made a tactical decision to exclude the matter.

Defendant also argues that the inadequacy of his representation is illustrated by the failure of his counsel to object during the course of the direct examination of Mrs. Iverson to an unresponsive answer to a question indicating that she had previously seen defendant act violently. The record indicates that defense counsel's objection to the particular matter was sustained, but that Mrs. Iverson was subsequently allowed to testify that she had seen defendant assault his wife when she was pregnant. When Mrs. Iverson was again asked if she had ever seen defendant pull a knife in her sister's presence and answered affirmatively, the testimony was stricken after it became apparent that the incident involved a different sister.

Defendant also contends that his counsel should have objected to other testimony indicating that he had previously attacked his wife with a knife. Under the circumstances, such evidence was clearly relevant to the issue of his intent and to refute the evidence of his good character that he had presented (Evid. Code, § 1101, subd. (b)).

The judgment is reversed.

Shoemaker, P. J., and Agee, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 16, 1969. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.