[Crim. No. 12168. Second Dist., Div. One. Apr. 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND ESCOBEDO, Defendant and Appellant.

G. Bruce Gourley, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert H. Francis, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—By indictment Raymond Escobedo was charged with the crime of murder in violation of section 187 of the Penal Code. In a jury trial he was found guilty of manslaughter in violation of section 192, subdivision 1, of the Penal Code. He was sentenced to state prison. He appeals from the judgment. His notice of appeal also states that he appeals from the verdict, the order denying his motion for a new trial, and the order denying probation. Since the verdict and the two orders last mentioned are not appealable, the purported appeals therefrom will be dismissed.

Appellant contends that the court erred in receiving in evidence the taped admissions or confessions, the broken knife, and the scabbard; that the deputy district attorneys were guilty of misconduct, and that the evidence was insufficient to support the verdict.

On August 6, 1965, about midnight, David Ledesma and Castulo Hernandez (known as "Whedo") were fighting in the front yard at the home of Charlene Triplett in Santa Maria, and at that time the defendant Escobedo was also in the yard. During the fight Ledesma was shot in the stomach. Miss Triplett testified that while those persons were in the yard she saw a knife in the hand of one of the persons, but she did not remember whose hand it was in; the blade of the knife was long and the handle was white; the knife was similar to the knife in evidence (Exhibits 4 and 5, being the handle and blade of a broken knife), but it is not the same knife; the knife that she saw that night was similar to a knife that she owned, but it was not the knife she owned; Escobedo was there with Ledesma, and they went away from her place in a blue and white automobile; after they left, she checked to see if the knife was in the dresser drawer where she kept it, but it was not there; the sheath in which she kept the knife was in the drawer but the knife was gone; Escobedo was one of many persons who had been in her house. She also testified that when she first talked with Officer Centeno she told him that she saw the knife in Escobedo's hand.

On said August 6, about midnight, Jesse Santana and Fred Ruelas, who resided in Santa Maria, went in Santana's automobile to the Tecate Cafe, in the area of Santa Maria known as Tiger Town, where they drank beer. The automobile was parked on the street near the front of the cafe. After they had been in the cafe about an hour, they met Buenaventura Calderon (victim), whom Santana introduced to Ruelas. Calderon wanted "a ride home," and after Santana offered

him a ride, he stayed with Santana and Ruelas for a while in that cafe and then went with them to the La Perla Cafe which was across the street. Upon entering that cafe, Santana and Ruelas went to the middle booth (of the three booths), sat there, and ordered beer. Calderon went toward the restroom at the back of the cafe, but returned about two minutes thereafter and sat in the booth and ordered beer. Santana sat at the side of the boothtable which was farther away from the cafe door. Ruelas sat at the end of the table which was at the back of the booth. Calderon sat at the side of the table which was closer to the door, that is, his back was toward the door.

Defendant Escobedo had parked Ledesma's blue and white Chevrolet automobile next to Santana's automobile which was near the front of the Tecate Cafe (across the street from the La Perla Cafe). Ledesma, the person who had been shot in the stomach while fighting in the yard, was in the automobile which Escobedo had parked.

While Santana, Ruelas, and Calderon were sitting in the booth at the La Perla Cafe, Escobedo entered the cafe and went to the booth, stood about two feet from Calderon, and told Santana that Santana's uncle (Ledesma) had been shot, and he (Escobedo) asked Santana to go out and help him. Santana said, "I don't want to go," and that he did not want to get involved or want anything to do with it. Escobedo, after staying there a few seconds, turned around and went out the door. As he was going toward the door he called Santana a "culo" (a Spanish word meaning the "rear end of a person").

Immediately after Escobedo left the cafe, Calderon pointed toward his shirt, told Santana to "look," and said that he had a cut. Santana saw blood on the right side of Calderon's shirt, and he told Calderon to go and get some help if he was hurt. Then Calderon got up and walked out the front door. While he was going toward the door and was passing a patron who was sitting at the bar near the door, he (Calderon) said, "Me chingaron." There are several translations of those Spanish words—the acceptable translation for a particular occasion depends upon the circumstances under which the words are used. There was testimony that a literal translation of the words is a foul expression. It is not necessary to state that translation here, since a proper or idiomatic translation is "They hurt me," and since the person who heard the word, as used by Calderon, understood them to mean that Calderon was hurt.

A blood spot, about the size of a man's hand, was on the booth seat where Calderon had been sitting, and there were drops of blood on the floor extending in a line from the booth seat to and through the front doorway—along the way Calderon had gone when he was leaving the cafe.

After Calderon left, Santana went out the front door, and then Santana went back to the booth and said to Ruelas. "Let's go." They went out of the cafe and ran across the street to Santana's automobile. While they were crossing the street, Calderon was standing on the sidewalk near the front of a store which was next to the La Perla Cafe. When Santana arrived at his automobile, he talked with Ledesma (his uncle) who was in Ledesma's nearby automobile. Escobedo was then standing on the right-hand or passenger side of Ledesma's automobile. Santana and Ruelas entered Santana's automobile and went to Santana's house.

A few minutes after Calderon left the La Perla Cafe, someone from outside the cafe called to Mr. Gordillo, the patron to whom Calderon had spoken while he was leaving the cafe. Thereupon, the patron went outside and saw Calderon standing by the window of the store which was next door to the cafe. The patron saw that Calderon was bleeding from someplace in the chest, and that blood was all over him. When the patron asked what had happened, Calderon told him to call the ambulance or the police. After the patron had started into the cafe to make the call, he returned to Calderon, who at that time was lying on the sidewalk, and asked him who did it. Calderon said he did not know. Then the police came.

An autopsy surgeon, who performed an autopsy on Calderon on August 8, 1965, testified that there was a stab wound, about 4 inches deep and ⅜ of an inch wide, on the right side of Calderon's chest at a place about 3 inches below and 3 inches back from the right nipple; the wound extended downward and inward between the seventh and eighth ribs, through the right chest cavity, through the right leaf of the diaphragm, and into the liver; there was extensive bleeding into the abdominal and chest cavities—about three pints of blood were in the abdominal cavity and about two pints were in the chest cavity; the stab wound caused the death; that the wound could have been produced by the knife blade, Exhibit 5 herein, and that the individual could survive this type of wound for minutes, and it is conceivable that he might survive it for approximately an hour.

Mr. Johnson, an electronic technician, testified that on

August 7, 1965, about 1:15 a.m., after he had been in the store next to the La Perla Cafe, he was walking across the street (in front of the store) intending to return to his vehicle which was parked on the side of the street opposite the store; when he was approaching the opposite curb he saw a knife blade and a knife handle (a broken knife) on the street—the blade and handle were about 3 feet apart; he did not touch the blade or handle, but he returned to the sidewalk in front of the store and told two officers, who were on duty there, what he had seen; they returned with him to the place where the blade and handle were; the blade and handle, Exhibits 5 and 4 herein, appear to be similar to the blade and handle which he saw on the street.

Officer Simons testified that on August 7, 1965, about 1:20 a.m., while he and another officer were in front of the store next to the La Perla Cafe investigating the injury to Calderon, Mr. Johnson came to them and said that he had seen a knife blade on the street; then the officers went with Mr. Johnson to an area on the other side of the street where they observed a knife blade and a knife handle; the blade was about 13 feet from the curb and the handle was about 9 feet from the curb; the blade and handle were 4 feet apart; he (witness) slipped a piece of paper under each of those objects and wrapped each object in the paper and took them (the blade and handle) to the police station; when he examined the blade and handle at the station, he observed reddish stains thereon which appeared to be blood stains; the blade and handle, Exhibits 5 and 4, are the knife parts which he picked up from the street; three or four patrol cars went to the vicinity at the time of the investigation of the stabbing, and to the best of Officer Simon's recollection one of the cars had been parked near the area where the knife parts were found.

Officer Centeno obtained the sheath (Exhibit 6) from a dresser drawer in the home of Miss Triplett, after he had received her permission to enter her home for that purpose.

Officer Hicks, the desk sergeant who was on duty at the police station during the early morning hours of August 7, 1965, testified that while Escobedo was in the booking cell of the station that morning, he asked the sergeant several times why he was in the cell; the sergeant replied that he did not know; on two or three occasions he asked to be allowed to go to sleep; one time when Escobedo called the sergeant to the cell, he (Escobedo) said: "If someone was killed, I killed him.

Now, give me a blanket and a bed and let me go to sleep''; he was in the cell about an hour and a half; the cell is about 6 feet by 6 feet in floor dimensions, and a small bench was in the cell; Escobedo was not booked on any charge that morning

Officer Centeno testified in part as follows: He talked with defendant at the police station about 3 a.m. on said August 7. Prior to asking questions, he told the defendant that he had the right to counsel prior to making any statement, that he had the right to remain silent, and that he did not have to say anything if he did not choose to do so. Defendant replied that he knew his ''damn rights.'' He (officer) did not know whether defendant was under the influence of alcohol, but he had the opinion that defendant had been drinking something of an intoxicating nature. When the officer asked whether the defendant would take a breathalyzer test, the defendant agreed to take it, but later he said he would not do it because he might be booked for being drunk. Later that morning the defendant was taken to a hospital where, at 3 a.m., a sample of his blood was drawn and placed in a container which was thereafter sent to a laboratory in Los Angeles. Defendant was not booked on any charge and he was released at 5 a.m.

Ray Pinker, chief chemist of the laboratory of the Los Angeles Police Department, testified in part as follows: He examined the knife handle and knife blade (Exhibits 4 and 5) and found that reddish-brownish material thereon was human blood, but there was not enough of the material to determine the blood group. His tests for fingerprints on the handle and blade were negative. By use of a microscope, he was able to fit the fractured end of the blade with the metal on the hilt of the handle, and he could identify the blade and the handle as being continuous, or attached, at one time. He also examined samples of blood from defendant and from Calderon, and he found that the blood from defendant showed .15 percent of alcohol, and the blood from Calderon showed .16 percent of alcohol. In his opinion, blood alcohol of .15 percent ''represents an amount of alcohol in which all human beings are under the influence to the point where they cannot prudently'' drive a motor vehicle.

Officer Lyons, a policeman in the Police Department of Las Vegas, Nevada, testified in part as follows: On November 13, 1965, about 1:30 p.m., he had a conversation with defendant at the police station. Officers Ketzenberger and Phillips were present at the conversation. The statements by defendant were

made freely and voluntarily. At the beginning of the conversation, Officer Ketzenberger, in advising the defendant of his constitutional rights, said that defendant had a right to consult an attorney or hire one, or remain silent, or anything that he said could be used in court against him. Later, Officer Ketzenberger asked the defendant if he remembered that he advised him of his rights to consult an attorney or to remain silent. About the middle or toward the end of the conversation, Officer Lyons advised defendant of his rights in that he reminded him of his right to consult an attorney, and that he did not have to say or sign anything. Defendant did not reply thereto at that time, but later he said that when he goes, he will get an attorney. The conversation was recorded on a tape recording machine. The recording was transcribed, and the transcription is correct.

Over the objection of defendant, the recording was received in evidence. The recording (as edited by agreement, or upon suggestion of defendant, to eliminate certain immaterial statements) was played in the presence of the jury. With reference to the officers' advising defendant as to his constitutional rights at the beginning of the conversation, and thereafter in the conversation, the recording included the officers' statements which were in substance the same as their statements on that subject as shown above in the testimony of Officer Lyons.

Some of the defendant's statements in the recording were in effect as follows: There was an argument and a fight by David Ledesma and some other guys at a drinking party which we were having at Charlene Triplett's home in Santa Maria, and Ledesma, a friend of defendant, was shot in the stomach by a guy whom defendant did not know. Defendant was there when it happened and he wanted to take Ledesma to the hospital but he said he was going by himself. Defendant went into a bar and asked Santana to help Santana's uncle who had been shot by some guy. Santana, a nephew of Ledesma, said that it was none of his (nephew's) business, and that he (Ledesma) should not have been in a fight "or something, I don't know. I can't remember too good; I was pretty drunk." Santana and two Mexican guys were sitting in a booth in a bar in Tiger Town. Defendant did not know the two guys. After Santana refused to help the uncle, the defendant went outside and went to the Crest bar, and the police took him in. Three days after Ledesma was shot, the defendant and his wife went to Las Vegas, because he was

scared and he did not want to get involved in the Ledesma shooting and the fight. Ledesma gave him a steak knife. Defendant did not remember any scuffle in the bar. He was in there and all of a sudden he went outside, he did not know what happened, and he was pretty drunk. The next day, when his wife read a newspaper, he heard that a fellow had been stabbed and had died. Defendant knew that he had the knife. He did not know what happened. He probably did it, he ''was the only one that had the knife.''

Officer Ketzenberger testified that at the time of the conversation the defendant had been in custody about 22 hours and he appeared to be sober and to understand what was said.

Defendant testified in part as follows: He did not know Calderon. When he was in the La Perla Cafe in the night of said August 6 he saw Ruelas and Santana who were with some other guy whom he did not know. He did not stab anyone there, did not have a knife with him, and he had never seen the knife handle and knife blade, Exhibits 4 and 5. Earlier that day he had seen a different knife in Ledesma's car. That knife had a wooden handle, was broken in front and rusty. He threw it under the seat of the car. He went into the cafe to see Santana and tell him to help his (Santana's) uncle, who had been shot and who was then in a parked car on the other side of the street. He talked to Santana for a few seconds, and Santana said that he did not want to help. The defendant called him a ''culo'' and then went outside. On cross-examination, defendant said that he did not remember talking to the police officers in Las Vegas; he did not say to those officers that Ledesma gave him a knife, or say that he remembered that he had the steak knife, or say that he knew he had the knife, or say that he probably did it, he was the only one that had the knife.

Appellant contends that the court erred in receiving the tape recording in evidence. He argues that he was not properly advised of his right to be represented by counsel, in violation of the rules in *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; that, although the officers knew that he was without funds, they told him that he could contact or consult an attorney if he wanted to hire counsel; and that he was not told that he would be furnished an attorney without cost if he is indigent. The recording, near its beginning, recites that one of the officers

said to defendant: "You understand that you don't have to give us a statement, that you have the right to remain silent or you can discuss the details of this case, you have the right to contact or consult an attorney if you want to hire counsel, or you can waive that right. Anything you do tell us can be used in a court of law against you. Now we don't want, we aren't going to use any coercion or duress or anything on you. What you do is strictly up to you." ▮ Under the rules in the above-mentioned *Escobedo* and *Dorado* cases, an accused is entitled to be advised of his right to counsel and his right to remain silent. In the present case, as shown in the above quotation and shown in other parts of the recording, the defendant was properly advised of those rights. Contrary to appellant's further above-mentioned argument, the officers were not required to advise appellant that he would be furnished an attorney without cost if he is indigent. This case was tried in January 1966, which was before the decision in *Miranda* v. *Arizona* (June 13, 1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Since the rule in the *Miranda* case is not retroactive, it is not applicable herein. (See *People* v. *Lookadoo*, 66 Cal.2d 307, 319 [57 Cal.Rptr. 608, 425 P.2d 208].)

▮ Appellant contends further that, even if he was properly advised of his rights, he did not intelligently waive his right to counsel or his right to remain silent. Some of the evidence to which he refers, as a basis for such contention, is as follows: He had an eighth-grade education. He cannot read or speak English very well. He testified that he did not understand the meaning of the word "counsel," and that he had been drinking before the recorded conversation. The recording recites that he was asked whether he had any objection to the taping of the conversation, and he replied: "I don't know about it, you know. I'll go along with it." Immediately following the above reference in the recording, he was asked whether he had been advised of his right to counsel and his right to remain silent, and he replied, "Wah, what do you mean?" The recording recites that he was asked whether he would give a written statement on what he had discussed with the officers, and that he replied: "No, when uh—when I go over there better, you know. . . . So I can talk to my family then. I know I am going to have to do it then, you know."

Some of the evidence to which respondent refers, as showing that appellant had been advised of his rights and that he

understood and intelligently waived his right to counsel and to remain silent, is as follows: The recording recites that appellant was asked, "Were you advised of your right to counsel?"; and that he replied, "Yes." The recording recites: "You understand that you don't have to say anything to us at all. Do you understand that?"; and that appellant replied, "Yeah." At a place in the recording, before appellant had said anything of an incriminating nature about stabbing or having a knife, the following statements were made: An officer said to appellant: "You've been advised of your rights by Sergeant Ketzenberger at the beginning of this." Appellant replied, "Yeah." The officer said, "Uh, to consult an attorney or to remain silent, you don't have to say anything or sign anything." Appellant said: "Yeah, well uh—when I go, uh—I want to get an attorney or something."

In addition to the above references in the recording, a transcript of the arraignment proceedings in Santa Barbara was received in evidence. The minutes of the arraignment state that defendant appeared without counsel, that he was advised of his rights and that he said that he preferred to hire his own attorney. Furthermore, when appellant was in the booking cell in Santa Maria on the morning of the stabbing, Officer Centeno advised him of his rights, and the appellant replied that he knew his "damn rights." The record, which shows of course many statements by appellant, establishes that he can speak English. Although he testified that he had been drinking before the recorded conversation, it is to be noted that Officer Ketzenberger testified that appellant had been in custody about 22 hours before the conversation and he appeared to be sober and to understand what was said.

The trial judge herein conducted a hearing out of the presence of the jury to determine the question as to admissibility of the recording, and at that hearing the recording was played. At the close of the hearing, the judge said: "I am going to admit the statement [recording]. . . . I feel that the defendant was sufficiently advised of his rights and the statement was voluntary. There was no evidence of any coercion or threat. The statement took less than one-half hour, less than an hour, rather to take. He was advised several times of his right to remain silent. I believe it was adequately stated that he had a right to an attorney." ▇ In *People* v. *Stafford,* 240 Cal.App.2d 422, 424 [49 Cal.Rptr. 598], it was said: "[T]he question of whether or not there has been a waiver is

primarily a question for the trial judge and his determination thereon should not be disturbed by a reviewing court unless it is palpably erroneous." (See *People* v. *Salcido,* 246 Cal. App.2d 450, 453-455 [54 Cal.Rptr. 820].) The findings of the court to the effect that appellant intelligently waived his right to counsel and his right to remain silent are supported by the evidence.

Appellant's further claim to the effect that he requested an attorney during the conversation is not sustainable. This claim is based upon appellant's statement, made in the recording, after an officer had again advised appellant of his right to counsel. Such statement of appellant was: "Yeah, well uh—when I go, uh—I want to get an attorney or something." In a preceding part of the recording there was conversation about officers coming from Santa Barbara to Las Vegas to take appellant to Santa Barbara under appellant's waiver of extradition proceedings. Appellant's counsel asserted in effect, at the trial, that the statement of appellant meant that he wanted counsel at the time of the conversation. The trial judge said: "There is nothing here that the specific request was made, and I believe he was sufficiently advised of his rights." As above shown, the statement of appellant was that "when I go, uh—I want to get an attorney or something." By reason of the extradition discussion and the use of the words "when I go," it appears that appellant was not referring to the time of the conversation, but was referring to a future time. It does not appear that appellant made a request for an attorney to represent him during the conversation.

 The court did not err in receiving the tape recording in evidence.

 Appellant contends further that the court erred in receiving the knife blade, the knife handle, and the scabbard or sheath in evidence. He argues that there was no competent evidence connecting those articles with appellant, or the alleged crime, or the decedent. There was evidence that the blade and handle were found on the street at a place which was near the opposite curb in front of the cafe where the stabbing occurred; that human blood stains were on them; that within a short time before Calderon collapsed on the sidewalk near the front of the cafe, the appellant went out of the cafe, crossed the street in front of the cafe, and stood by a parked car which was near the place where the blade and handle were found; that the blade and handle were parts of a

knife that had been broken; that automobiles had traveled recently in the area where the broken knife was found; a knife similar in appearance to the broken knife had been in the house of Miss Triplett prior to the fight which occurred in her front yard when appellant was present; the similar knife, which had been in her house, was missing from its accustomed place therein after the fight and after appellant and Ledesma had gone away in an automobile; appellant had been in her house; she saw a knife in the hand of someone during the fight; although she testified that she did not remember who had a knife, she also testified that she had told an officer that she saw a knife in appellant's hand; the stab wound could have been caused by such a blade as the one found in the street; the appellant told the officers in Las Vegas that Ledesma had given him a steak knife, that after he heard that a man in the cafe had been stabbed and had died, he knew that he had a knife but he did not know what happened, and he probably did it, "he was the only one that had the knife." The court did not err in receiving the knife blade and handle in evidence. The scabbard or sheath was also properly received in evidence. It was material with respect to the issue as to where the knife was obtained.

▪ A further contention of appellant is that the deputy district attorneys were guilty of misconduct in asking certain questions and in making certain arguments. Appellant asserts that questions by one of the deputies, while Shirley Escobedo was a witness, as to whether she and appellant were husband and wife tended to degrade appellant by casting a reflection on his moral character, since her answers were to the effect that she was living with appellant as his common law wife. The questions were material on such issues as bias, prejudice, or interest of the witness.

▪ Appellant also asserts that one of the deputies improperly attempted to impeach Miss Triplett, a witness called by the People. After she had testified that she had seen a knife in someone's hand during the fight but could not remember whose hand it was, one of the deputies asked whether she had told an officer that she had seen a knife in appellant's hand. She replied in the affirmative. Then the deputy said: "You don't deny, then, at this time that Escobedo had the knife then, is that correct?" Appellant's objection to the question was sustained. Another question by a deputy was: "And you saw a knife similar to that in Escobedo's hand, is that right, on that night?" An objection

thereto was sustained. In view of all the circumstances prevailing at that time with respect to asserted hostility of the witness, it cannot be said that the deputy was guilty of misconduct.

Appellant also asserts that one of the deputies made an improper argument, in the presence of the jury, when the appellant objected to introduction of the broken knife in evidence. In the argument referred to, a deputy said: "The court will recall that Miss Triplett testified that on the evening of this occurrence, earlier in the evening she saw a knife of a similar type in the hands of Mr. Escobedo." Appellant states in his brief that upon the hearing of his motion for a new trial, his counsel cited that comment of the deputy district attorney as misconduct. Appellant then recites extended colloquy, at that hearing, with respect to whether the statement was made in the presence of the jury,—the deputy was of the opinion at that time that he had not made the statement in the presence of the jury. In any event it is not necessary to relate the colloquy here. At the time the statement was made at the trial, counsel for appellant stated that the deputy's statement was incorrect. In the instructions which were given later, the jury was instructed not to consider as evidence any statement of counsel. In view of said comment of appellant's counsel and in view of the instruction, it does not appear that the statement of the deputy was prejudicial misconduct.

Appellant also asserts that the deputy district attorney, in his argument to the jury, was guilty of misconduct in that, while referring to Miss Triplett's testimony, he said: "She made a statement sometime prior to that as to the party that she had seen it [knife] in the hand of. Now, she said she couldn't remember whose hand she had seen the knife in." Appellant contends that the deputy was arguing the probative value of a prior inconsistent statement which was introduced for impeachment purposes. A question arises as to whether the deputy, in referring to a prior statement, was referring to a statement she made to Officer Centeno or was referring to what he might have thought was her testimony at the trial. In any event, since no objection was made to the statement, it is not necessary to determine this assignment of alleged misconduct.

A further contention of appellant is that one of the deputy district attorneys was guilty of prejudicial misconduct in his argument to the jury wherein he said: "She [Miss

Triplett] saw a knife, and she also testified that after the fight the knife disappeared and went with the car in which David Ledesma was in and also the defendant, Escobedo. That automobile, then, went to Tiger Town and to the La Perla Cafe. The knife was in the car. Now, . . . there is evidence . . . that a person was stabbed in the La Perla Cafe, showing that whoever stabbed him had a knife. The fact that he had a knife before he went to the La Perla Cafe is evidence that there was provocation to a certain extent. That he was after somebody. He was going. He had a deadly weapon in his hand.'' Appellant asserts that said statement was a misstatement of the evidence. Then appellant states that Miss Triplett testified that appellant and Ledesma left her property on the evening in question (after the fight). Appellant refers to a statement in the transcript that she testified that she did not see the knife after they left. Appellant then cites a further part of the deputy's argument wherein he said: ''She testified that the knife that she saw there that night disappeared in the car.'' Thereupon counsel for appellant objected, stating that the deputy was summarizing facts not in evidence. The deputy made a statement to the effect that that was the testimony as he recalled it, and that if the defendant sees it differently he can have the testimony read. Counsel for appellant said: '' [W]e are objecting on the basis that this is not in the record.'' The judge said that ''the statements [of counsel] are not evidence in the case. Whether or not any statement of counsel is supported by the record is for you to decide.'' Then the deputy said that, as he recalled it, the statements referred to by him were in the testimony, and that if the defendant or jury wanted the testimony read that could be done after the argument. The judge said: ''Check the record during the noon recess and we will clear it up.'' It does not appear that the record was checked thereafter or that anything further was done to clear up the matter. It appears that the deputy was stating, in good faith, the testimony as he recalled it, and he was suggesting that the testimony be read. In view of the admonition given by the judge at the time the objection was made, and in view of the instruction given later that the jury must not consider as evidence any statement of counsel, it does not appear that prejudice resulted from said argument.

Appellant contends further that the evidence was insufficient to support the verdict. Since the evidence is set forth hereinabove in considerable detail, it would serve no useful

purpose to restate it here in summary manner. The evidence was sufficient to support the verdict and the judgment.

The purported appeals from the verdict, the order denying the motion for a new trial, and the order denying probation are dismissed.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.