[Crim. No. 27273. Second Dist., Div. Four. Mar. 31, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
DECATUR JAMES, JR., Defendant and Appellant.

## COUNSEL

Hal F. Baron, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Russell Iungerich and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—Defendant Decatur James, Jr., was charged, in count I of an information, with burglary, in violation of Penal Code section 459; in count II, with robbery, in violation of Penal Code section 211; and in count III, with rape, in violation of Penal Code section 261, subdivision 2. Defendant's *in limine* motion to preclude the use, for impeachment purposes, of three prior convictions (pursuant to *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] and Evid. Code, § 352) was granted. By amendment to the information, three prior felony

convictions were alleged; defendant admitted the priors. He entered a plea of not guilty. Trial was by jury.[1]

Defendant was found guilty on all three counts; the burglary and robbery were found to be of the first degree. His motion for a new trial was denied. Probation was denied. Defendant was sentenced to state prison for the term prescribed by law; count I and count II were merged into count II; the sentences on count II and III were ordered to run concurrently. The court struck the prior felony convictions in the interest of justice. Defendant appeals from the judgment of conviction.

On May 18, 1974, Mrs. Violet Nunnelley and John Watkins were awakened in the bedroom of Mrs. Nunnelley's Glendale apartment at 3 a.m. by their barking dog. Mrs. Nunnelley was the owner and manager of the apartment motel in which she was living. While the windows were covered by a light bedspread, there was some light from a street lamp entering the room. Nunnelley and Watkins saw an intruder, a large Negro man wearing white coveralls, who demanded money. Mrs. Nunnelley gave him all she had in her purse, to wit, $13, to which he responded: "Well, where's the rest of it?"

The intruder tied up Mr. Watkins with strips of a towel. He stated to the victims, respectively: "I am going to kill you, and I'm going to kill you, too." A second man, somewhat smaller, also Negro, came into the room. The larger man told him to "[g]et outside and stay where I told you to stay." After about five seconds, the smaller man disappeared.

The big man was holding what appeared to Mrs. Nunnelley to be the blade of a carpet knife, or a razor. He started to disrobe Mrs. Nunnelley, saying: "I think I see something valuable."

Mr. Watkins suggested that she give the man the pennies the couple had been saving. Mrs. Nunnelley was led into the kitchen, to get the pennies; she turned on the overhead light. She was able to observe the intruder for a few seconds as he stood in the kitchen doorway, but he said: "I didn't tell you to turn that light on," and she then turned the light off.

The intruder then took Mrs. Nunnelley to the bathroom where he attempted to have sexual relations with her. He asked her for some

---

[1]Defendant was jointly tried with Walter Bowie, who was charged with the same three offenses, but was acquitted by the jury.

lotion, and she gave him a bottle of lotion. He disrobed her, forced her to lie down on the bathroom floor, and commenced sexual intercourse. He was interrupted by Mrs. Nunnelley's elderly mother, who had been sleeping in the apartment's other bedroom, and who opened her door, thereby causing the light from her room to shine into the bathroom. When she saw the intruder, she slammed her door and began to scream. Mrs. Nunnelley said to the intruder: "You had better get out of here while you have a chance," and he then ran out the front door, taking with him the $13 and the jar of pennies.

Mrs. Nunnelley untied John Watkins, who called the police. Glendale Police Officer Desario responded to the call, was given physical descriptions of the two suspects, and investigated the scene. He determined that the kitchen window over the sink was probably the point of entry; outside was a parked vehicle covered with dust except for the left fender, where the dust had been rubbed off. He was of the opinion that access to the window had been achieved by standing on the fender of the car; the window was approximately 10 feet above the ground. He also found under the window a wallet that contained a California driver's license issued to Walter Bowie as well as miscellaneous identification papers. Mrs. Nunnelley testified that other items of possibly relevant evidence, i.e., the strips of towel used to tie Mr. Watkins, and the bottle of lotion, were thrown away.

When the victims described the suspects to Desario, suspect No. 1 was described as a very large Negro man in white coveralls, of middle age, 6 feet 3 inches tall, weighing approximately 230 pounds. The second man was smaller, weighing about 160 pounds. On cross-examination, defense counsel elicited from Mrs. Nunnelley that she thought defendant and codefendant Bowie were the men who had robbed her in a prior robbery on March 2, although she had failed to identify either of them at the preliminary hearing concerning the March 2 robbery.

Watkins also told the police that earlier in the evening of the crime, at about 11:30 p.m., May 17, he had gone out to get some cigarettes, and had gone to a bar called "The Scene," located near the Nunnelley apartment. He was having a drink with a friend at this bar when he observed among those present a large Negro male, dressed in white coveralls. Watkins testified that this was the same man who appeared in the Nunnelley bedroom. Watkins was contradicted by the police report which indicated that Watkins had told the police that it was Bowie he

had seen at the bar and later in the apartment; Watkins explained at trial that the police report was a mistake; that it was defendant he saw at the bar and later in the apartment as the larger of the two intruders.

On May 28, 1974, 11 days after the date of the offense, Officer Edwards showed Mrs. Nunnelley 6 photographs; within 30 seconds, she selected a picture of defendant, but did not identify Bowie. On the same occasion, but separately, Watkins was shown two cards containing six to eight photographs each, and he selected Bowie's picture, but not that of defendant. Mrs. Nunnelley identified defendant at trial as the robber who raped her, but did not identify Bowie as the second intruder. Watkins identified both defendants at trial. It developed that he had seen defendant James, appellant herein, at a preliminary hearing the previous December, when he looked through a courtroom door.

Cross-examination of Nunnelley and Watkins on the subject of identification revealed that both victims wore glasses for reading; and that Nunnelley had, at best, perhaps four seconds of observation of the larger suspect in the kitchen with an overhead light.

Defendant, who testified in his own behalf, presented an alibi defense. He stated that he was sleeping with his wife in Pomona at the time of the crime. Upon cross-examination, defendant was questioned about his activities from May 18, 1974, to November 1974, when he was arrested in New York. He denied that he had fled to Mexico after the crime and had lived there with another fugitive, Simon Staples. He admitted that he might have seen Simon Staples in Mexico during this period. He stated that he had found out sometime during the summer that the police were looking for him, but did not contact the police. He denied that his wife, Loretta, and Simon Staples' mother had made trips to Mexico to give Staples and himself money to live on.

Defendant's wife, Loretta, also testified in defendant's defense. She stated that on May 17, 1974, defendant came home about 7:30 p.m.; that she, defendant and Mrs. Staples spent the evening moving furniture from Hollywood to Pomona, where she and defendant had just purchased a home; and that at about 1 or 2 a.m., she and defendant had gone to sleep in Pomona.

Mrs. Loretta James was also cross-examined at length about her husband's activities between May 18, 1974, and November 1974. She stated that defendant was in Pomona in late May and June, except for a

few days he spent in Indio. She testified that in early June, she and Mrs. Staples visited Police Officer Edwards at the Glendale Police Department; that she asked Edwards if defendant was wanted by the police, and why; and she was told why. She denied using Mrs. Staples' telephone during the early summer months to receive long-distance collect calls from Mexico and Montana. She also testified on cross-examination that during July 1974, defendant was in Pomona; that she stayed with Mrs. Staples for a short time in July because she and defendant were not getting along; that in August, she and defendant went to Indio, where they stayed until October 1974; that they then travelled east and defendant was arrested in New York. Mrs. James denied that defendant had stayed in Mexico with Simon Staples after the May 18 incident, and further denied that she had taken money to defendant in Mexico during this period.

Mrs. Lillian Staples testified on defendant's behalf and corroborated defendant's account of the activities of defendant, his wife, and her on the evening of May 17. She was cross-examined about trips to Mexico and long-distance phone calls, but denied any knowledge of these matters.

Codefendant Walter Bowie, testifying in his own defense, stated that he had lost his wallet about May 9 or 10, 1974.[2] He related this account of his activities on the evening of May 17, 1974: he, defendant, and one Jesse Strong had visited three crap games; Bowie had done considerable drinking. He fell asleep at the last game at about 1 a.m. and did not awaken until 6 a.m. Defendant drove Bowie to defendant's home in Bowie's car; Bowie was very sick but then drove his car home from defendant's house. Bowie noticed that when he and defendant went to get Bowie's car at 6 a.m. when Bowie awoke at the crap game, his automobile had not been where he had last seen it, and that the tank contained less gasoline than when he had left it at the location of the last game on the night of May 17. Bowie testified that defendant was wearing white coveralls on the night of May 17. (Williams, the employer of both defendant and Bowie, testified that he saw them both during the day of May 17, and that defendant was wearing white coveralls.) Bowie also testified that defendant's wife, Mrs. James, had asked him to testify that defendant had brought him home on the evening of May 17, 1974, at 7:30 p.m., instead of in the early morning hours of May 18, 1974.

---

[2]The wallet was not introduced as an exhibit at trial; it was "ordered destroyed" by the Glendale police prior to trial, according to the testimony of Officer Edwards.

Simon Staples was brought in from jail to testify in rebuttal for the prosecution. He denied living with defendant in Mexico, but stated he had seen him there. He denied making statements to his parole officer, John Okel, when asked if he had made such statements.

John Okel was called to testify for the prosecution, also as a rebuttal witness. He stated that he was looking for Simon during the spring and summer of 1974 because of Simon's suspected participation in another crime. He recalled interviewing Simon's mother, Mrs. Staples, who told him her son was in Mexico with defendant, that she and Mrs. James had gone there to give the men money, and that Mrs. James had received some long-distance calls on the Staples' telephone, in June and July 1974.

Defendant's court-appointed counsel has made three contentions on defendant's behalf on this appeal. Defendant has raised an additional issue by written communication to the court, which has been filed as a supplemental brief. We consider first those issues raised by counsel.

Defendant contends that the in-court identification by Mrs. Nunnelley was "tainted" by unfair pretrial identification procedures, and should not have been admitted into evidence. The People argue that since defendant's trial counsel made no pretrial motion nor timely at-trial objection to exclude Mrs. Nunnelley's pretrial identification of defendant, which involved showing Mrs. Nunnelley a series of six photographs, and, further, that since defendant's trial counsel did not make a timely objection to the admission of Mrs. Nunnelley's identification testimony at trial, the issue has not been properly preserved on this appeal.

The record does establish the failure of trial counsel to attack the victim's pretrial identification by the methods described above. Either procedure, pretrial motion or timely trial objection, would have been appropriate to secure a trial court determination of whether the procedure employed by the investigating police officer was a constitutionally impermissibly suggestive one, with misidentification as a likely result. (*People* v. *Martin* (1970) 2 Cal.3d 822, 832, fn. 11 [87 Cal.Rptr. 709, 471 P.2d 29]; *People* v. *Hill* (1974) 12 Cal.3d 731, 765 [117 Cal.Rptr. 393, 528 P.2d 1].) Defense counsel did move late in the trial to suppress Mrs. Nunnelley's identification testimony, but the trial court ruled that the objection came too late to warrant consideration.

It is generally true that waiver of the identification issue at trial precludes consideration of the issue on appeal. (*People* v. *Johnson* (1974) 38 Cal.App.3d 1 [112 Cal.Rptr. 834].) We need not decide, however, whether that principle applies when an appropriate motion, though untimely, has been made below. ■ Our concern, on appeal, is whether the failure to make timely and appropriate motions concerning a possibly "tainted" pretrial identification constitutes a denial of due process, due to inadequate representation by trial counsel. (See *People* v. *Carter* (1975) 46 Cal.App.3d 260, 265, fn. 4 [120 Cal.Rptr. 181].) Therefore, we have examined the exhibits in this case, including the six photographs presented to Mrs. Nunnelley, from which she immediately selected the photograph of defendant. The pictures all showed Negro males of mature age; two of the pictures (of defendant and codefendant Bowie) have numbers at the bottom of the pictures; one other unselected photograph was labeled, at the bottom, "Sheriff's Department."

"A violation of due process [in identification procedure] occurs only when the pretrial procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. [Citations.]" (*People* v. *Enos* (1973) 34 Cal.App.3d 25, 38 [109 Cal.Rptr. 876].) Resolution of this issue involves consideration of the "totality of the circumstances." (*Enos, supra,* 34 Cal.App.3d 25, at p. 38; *People* v. *Blum* (1973) 35 Cal.App.3d 515, 519 [110 Cal.Rptr. 833].) Our examination has led us to conclude that the "totality of the circumstances" in the instant case does not reveal unfairness in the identification procedure employed, despite the fact that numbers appeared on the pictures of defendant and codefendant. (See *People* v. *Hill, supra,* 12 Cal.3d 731, at pp. 765-767 (involving dated photographs, which were held not impermissibly suggestive).)

We thus conclude that trial counsel's failure to request a hearing outside the presence of the jury on this issue, or to make timely objection at trial did not substantially affect the fairness of defendant's trial, nor did it reduce it to a "farce or a sham." (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) Identification of defendant was the crucial issue at trial, and was explored thoroughly by vigorous cross-examination of Mrs. Nunnelley, a cross-examination which touched upon her eyesight, the short period of time (seconds) in which she had the opportunity to see the larger intruder in her lighted kitchen, and her identification of defendant by photograph approximately 10 days after the crime. We hold that defendant received adequate representation in this regard, and that no claim of unfairness is

supported by the record: (See *People* v. *Floyd* (1970) 1 Cal.3d 694, 709-715 [83 Cal.Rptr. 608, 464 P.2d 64], holding that failure to make similar motions was not inadequate representation within the context of that case.)

 Defendant next contends that the trial court improperly restricted the cross-examination of prosecution witness John Watkins, who was with Mrs. Nunnelley at the scene of the crime. Defense counsel commenced questioning of this witness concerning his employment and financial dependence upon Mrs. Nunnelley, with the purpose of showing that he was not employed and was in fact living with, and financially dependent on, Mrs. Nunnelley. The prosecution's objection to this line of questioning, on the ground that it was irrelevant to the issues of the case, was sustained. Defendant argues that the questions, though irrelevant to any substantive issues in the case, were relevant to attack the credibility of the witness, and, hence, were asked to elicit relevant evidence.

The Evidence Code defines "relevant evidence" to include evidence that is relevant to the credibility of a witness. (Evid. Code, § 210.) Defendant argues that the questions should have been allowed, because the answers given might have provided information from which the jury could have inferred that Watkins was biased toward Mrs. Nunnelley's position as prosecutrix at trial, and would testify in support of her as an expression of enlightened self-interest.

 The existence of a bias, interest, or motive to falsify is a commonly used factor to attack the credibility of a witness. (Evid. Code, § 780, subd. (f).) Such bias, interest or motive may be elicited by cross-examination of a witness as well as established by extrinsic proof. (*People* v. *De Leon* (1968) 260 Cal.App.2d 143 [67 Cal.Rptr. 45]; *People* v. *Pierce* (1969) 269 Cal.App.2d 193 [75 Cal.Rptr. 257].) (See Jefferson, Cal. Evidence Benchbook (1972) § 28.8, pp. 458-463; (1975 Supp.) § 28.8, p. 139.) Relationship of a witness to others involved in the case is a material fact bearing on the credibility of the witness. (*People* v. *Escobedo* (1967) 250 Cal.App.2d 417 [58 Cal.Rptr. 426].) While the trial court possesses sound discretion in determining the extent of cross-examination designed to attack the credibility of a witness, it is a well established principle that considerable latitude must be granted to a cross-examiner for this purpose, particularly when the cross-examination is of a witness who has testified against a defendant in a criminal prosecution. (*Jennings* v. *Superior Court* (1967) 66 Cal.2d 867 [59

Cal.Rptr. 440, 428 P.2d 304].) Refusal to permit cross-examination of a prosecuting witness to establish bias or prejudice has been held to constitute reversible error. (*People* v. *Grantham* (1972) 26 Cal.App.3d 661 [103 Cal.Rptr. 262]; *People* v. *Mahle* (1969) 273 Cal.App.2d 309 [78 Cal.Rptr. 360].) ██ Defendant's proffered cross-examination of the prosecution witness, John Watkins, concerning his relationship and possible financial dependence on Mrs. Nunnelley, should have been allowed by the trial judge. The error in not permitting it, however, is not, in our view, sufficiently prejudicial to defendant to necessitate reversal.

██ Defendant's counsel on appeal also contends that the trial court erred when it allowed defendant to be cross-examined about his activities after the date of the crime, May 18, 1974, and during the period prior to November 1974, when defendant was apprehended in New York, since defendant did not testify concerning these matters on direct examination. The People argue that defendant's conduct after the crime was relevant in establishing the element of flight, which may be considered by the jury as proof of consciousness of guilt; and that, therefore, cross-examination on this subject was proper.

It is established law in California that, apart from matters affecting credibility, cross-examination of a witness is limited to the scope of the direct examination. (Evid. Code, § 773.) This is not a strait-jacket rule for the ordinary witness, since the trial judge has a discretion to permit the cross-examiner to go beyond the scope of the direct examination. In such case, the cross-examiner is then engaging in direct examination of the witness (Evid. Code, § 772, subd. (c)) with its restrictions against "leading questions." (Evid. Code, §§ 764 and 767.)

██ A defendant in a criminal case, however, may not be examined by a cross-examiner beyond the scope of the direct examination. (Evid. Code, § 772, subd. (d).) The basis of this limitation on the cross-examination of a defendant in a criminal case is the constitutional privilege against self-incrimination. To permit the prosecutor to exceed the scope of the direct examination in examining a criminal defendant would amount to forcing such defendant to become the prosecution's witness. (*People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841].)

██ A defendant in a criminal action may waive his privilege not to be called as a witness and not to testify by voluntarily taking the witness stand and testifying in his own behalf. By so doing, he waives his

privilege against self-incrimination, but only to the extent that he may be cross-examined regarding any matter (1) to which he has testified *expressly* on direct examination, (2) to which he has testified *impliedly* on direct examination, and (3) that is relevant to impeach the defendant's credibility as a witness. (*People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Ing* (1967) 65 Cal.2d 603 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *Wilson* (1967) 254 Cal.App.2d 489 [62 Cal.Rptr. 240].)

The major problem with respect to the scope of cross-examination of a defendant in a criminal action is that of determining what matters of *implied* testimony flow *by inference* from defendant's *express* testimony on direct examination. The guiding principle that is derived from the decisional law is to the effect, that, if the facts testified to by a defendant on direct examination amount, by inference, to a *denial* of the charge, he may then be cross-examined with respect to any matter tending to prove his guilt. An implied denial of guilt is considered as testimony denying the existence of any evidence relevant on the issue of guilt, which makes cross-examination about the subject of any such evidence properly within the scope of the direct examination. (See *People* v. *McClellan* (1969) 71 Cal.2d 793 [80 Cal.Rptr. 31, 457 P.2d 871]; *People* v. *Eisenberg* (1968) 266 Cal.App.2d 606 [72 Cal.Rptr. 390].)

In *Ing* and *Thornton,* this principle made permissible—cross-examination of defendant regarding prosecution evidence of noncharged crimes—evidence which the prosecution had introduced on the issue of identification under the relevancy theory of common scheme or plan.

■ The express or implied general denial of guilt by a defendant on direct examination constitutes a waiver of his self-incrimination privilege to the extent of permitting cross-examination about facts indicating guilt even though evidence of such facts have not first been introduced by the prosecution in its case in chief. (*People* v. *Martin* (1971) 17 Cal.App.3d 661 [95 Cal.Rptr. 250] (cross-examination of defendant about lack of employment to establish motive to sell narcotics, with no evidence of motive offered as part of prosecution's case in chief); *People* v. *Bagwell* (1974) 38 Cal.App.3d 127 [113 Cal.Rptr. 122] (cross-examination of defendant about a prior stabbing to rebut defendant's denial of an intent to kill victim, no evidence of the prior stabbing having been introduced as part of prosecution's case in chief).)

In the case at bench, defendant testified on direct to an alibi for the time of the crime but offered nothing concerning his activities after May 18, 1974. Although a series of objections were made, some of which were sustained and some overruled, the prosecution was allowed to elicit from defendant, his wife, and Mrs. Staples, denials of implications in the prosecutor's questions that defendant had discovered, at least by early June 1974, that the Glendale Police Department was looking for him in connection with the instant case; that he thereafter absented himself from California to avoid the police; that he was successful in this endeavor until November 1974. Many of the cross-examination questions of Mrs. James and Mrs. Staples were beyond the scope of the direct examination, but could be considered appropriate under the trial judge's discretion to permit direct examination by the cross-examiner of a witness other than a criminal defendant. Some of the questions were relevant on the issue of credibility—to secure denials of relevant matters that the prosecution could have proved independently of the witness' denials.

The cross-examination questions of defendant which it is claimed went beyond the scope of direct examination related for the most part to efforts by the prosecutor to establish that defendant had left the state after knowledge that he was a suspect and that he had remained away until his arrest in New York many months later. As a part of its case in chief, the prosecution had introduced no evidence relative to the subject of flight or defendant's efforts to escape arrest or apprehension. But in view of defendant's express alibi testimony which constitutes *implied* testimony of denial of guilt, the cross-examination was within the scope of the direct examination within the rule of the cases of *Martin* and *Bagwell,* both *supra.*

Subsequent rebuttal testimony by the prosecution tended to establish that defendant spent considerable time in Mexico during this period from May to November, and was visited by his wife on occasion for the purpose of receiving funds to live on while avoiding detection.

We note that flight after a crime has long been considered relevant to guilt on the part of a defendant. (Pen. Code, § 1127c; *People* v. *Hill* (1967) 67 Cal.2d 105 [60 Cal.Rptr. 234, 429 P.2d 586].) While the standard flight instruction contains the word "immediate" in reference to flight, the decisional law has adopted a very broad definition of the term. It has been held that evidence of *absence* from the general area of the

crime situs is sufficient to support the giving of a flight instruction to the jury. "It was for the jury to determine whether appellant's conduct [absence of a year from the scene] amounted to flight and the significance and weight to be attached to such circumstance." (*People* v. *Olea* (1971) 15 Cal.App.3d 508, 516 [93 Cal.Rptr. 265].)

In terms of relevancy, the question is whether evidence of the conduct of defendant after the alleged commission of a crime, whether it be labeled flight, evasion of apprehension, or consists of other conduct such as attempted suicide or escape from custody (*People* v. *Terry* (1970) 2 Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961] (attempted escape six months after date of crime)), can be said to constitute circumstantial evidence of guilt, by the circumstantial-evidence-reasoning process of first, a reasonable inference of consciousness of guilt from such conduct, and second, an inference from the state-of-mind fact of consciousness of guilt to the fact of commission of the offense in conformity with such state of mind.

Since the facts of flight and absence from the state are facts that are relevant to the principal issue of defendant's guilt, the cross-examination of defendant and of defendant's witnesses did not violate the evidentiary principle that cross-examination may not be undertaken to elicit denials for the purpose of producing answers to be contradicted on matters which the prosecution could not properly prove independently of the denial testimony. (See *People* v. *Lavergne* (1971) 4 Cal.3d 735 [94 Cal.Rptr. 405, 484 P.2d 77].)

We thus hold that the cross-examination of defendant with respect to flight and absence from the state was proper, as it tended to negate his direct examination testimony of alibi and its implied denial of guilt, and as it also tended to cast doubt upon the supportive testimony of defendant's wife and Mrs. Staples.

■ In his supplemental brief, defendant has raised the issue of destroyed evidence, evidence which he claims would have assisted him in establishing his innocence. While no issue was clearly framed in this regard for trial court determination, we review the situation in view of the constitutional implications of the recent Supreme Court ruling in *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361].)

The record shows that in the early morning hours of May 18, 1974, investigating Police Officer Desario discovered a wallet lying beneath the

window of the Nunnelley apartment. In that wallet was the California driver's license issued to codefendant Bowie, and apparently other papers as well. The license was used by the prosecution at the preliminary hearing, and was also introduced as an exhibit at trial, but the wallet was not preserved. The following testimony was heard at trial, with respect to the wallet, during cross-examination of investigating Police Officer Edwards: "BY MR. COTTON: [¶] Q My only question would be directed to the wallet that contained certain documents. Do you know what happened to the wallet, sir? [¶] A Yes, I do. [¶] Q What happened to it, sir? [¶] A It was ordered destroyed by the Glendale Police Department. [¶] Q Do you know about when that was ordered destroyed? [¶] A The 2nd of this month."

No explanation was given as to the circumstances under which the wallet was "ordered destroyed." *Hitch* tells us that the prosecution has a duty to disclose and to preserve evidence when there is a reasonable possibility that it would be favorable to a defendant, and that a trial court must determine, as it does when dealing with anonymous informants, whether the prosecution has made reasonable efforts to preserve material evidence. (*Hitch, supra,* 12 Cal.3d 641, at pp. 648-650.) If the efforts are found to be unreasonable, then "sanctions for nondisclosure" of the evidence may be imposed by the trial court. *Hitch* was to be applied only prospectively, but since it was effective at the date of the trial herein, its impact must be considered.

Defendant argues that the wallet contained receipts which would establish that codefendant Bowie was in possession of the wallet on May 17, and had not lost it at an earlier date, as he claimed at trial. This evidence would have cast doubt on Bowie's entire trial testimony, as such evidence, if in existence, would have been extremely damaging to codefendant Bowie's story about his lost wallet, and might well have damaged other testimony which had a tendency to implicate defendant in the criminal activity on May 18.

We agree that the existence of such receipts, dated May 17, would have seriously damaged Bowie's trial testimony, but mostly in reference to himself. While Bowie's credibility had some bearing on defendant's case, the receipts in question would not have exculpated defendant, i.e., established his innocence. Thus, we can and do distinguish the instant case from *Hitch,* and hold that the destruction of the Bowie wallet did

not, under the circumstances presented herein, deprive defendant of a fair trial.

The judgment appealed from is affirmed.

Kingsley, Acting P. J., and Dunn, J., concurred.