Filed 9/29/15  P. v. Koch CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E061609 |
| v. | (Super.Ct.No. FVI801806) |
| STEVEN KOCH, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Eric M. Nakata, Judge. Affirmed.

Richard V. Myers for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Steven Koch was found guilty of sexually molesting his eight-year-old granddaughter. A jury convicted him of two counts of oral copulation or sexual penetration with a child (Pen. Code, § 288.7, subd. (b));[1] committing a lewd act on a child (§ 288, subd. (a)); and being a felon in possession of a firearm (§ 12021, subd. (a)(1)).[2] Defendant admitted to five serious or violent prior convictions under sections 667 and 1170.12. The court sentenced him to a total term of 140 years to life in state prison, composed of 45 years to life for each of the two oral copulation/sexual penetration counts, 25 years to life for the lewd act count, and 25 years to life for the firearm count.

Defendant raises several arguments on appeal. He argues that the court erred in admitting evidence that he had raped his stepdaughter in 1987, evidence of his attempt to commit suicide during his arrest, and photographs of the shotgun police found at his home. Defendant also argues that the court erred in responding to a jury question regarding the shotgun, the firearm conviction should be reversed for insufficient evidence, the prosecutor engaged in misconduct during closing argument, and he was deprived of his right to effective assistance of counsel. We affirm the judgment.

[1] All further unspecified statutory references are to the Penal code.

[2] Effective January 1, 2012, former section 12021, subdivision (a) was repealed and reenacted without substantive change as section 29800, subdivision (a). (See Cal. Law Revision Com. com., Historical and Statutory Notes, 51D, pt. 4, West's Ann. Pen. Code (2012 ed.) foll. § 29800, p. 194.) All further references to section 12021, subdivision (a) are to the former version.

# I

## FACTUAL AND PROCEDURAL BACKGROUND

1.    *Defendant's Molestation of A.C.*

The victim, A.C., lost her mother in a car accident when she was an infant.  Not long after, A.C.'s maternal grandparents obtained custody of her after they discovered her biological father was physically abusing her.  Her father's parental rights were ultimately terminated and, in 2005, she was adopted by her maternal grandparents.  Defendant is her paternal grandfather.

In early 2008, defendant contacted A.C.'s mother to ask if A.C. could visit him and his wife at his home.  Her mother thought it would be good for A.C. to get to know her father's side of the family.  During the summer of 2008, A.C. spent a significant amount of time at defendant's house in Hesperia.  She was eight years old at the time; defendant was 57.

One day in August 2008, A.C. complained to her mother about redness and irritation in her vaginal area.  Her mother applied ointment to the area and attributed the irritation to the increased time A.C. had been spending swimming.  Later that month, the school principal informed her mother that A.C. had told a friend that defendant had been molesting her.

As part of the police investigation, her mother took her to the Loma Linda Children's Assessment Center for a physical examination. Dr. Amy Young, a pediatric physician, examined A.C. At trial, Dr. Young testified that she observed two fissures in the folds of A.C.'s anus. She characterized these fissures as abnormal, and opined that they could have been caused by constipation or sexual molestation. She explained that a child can develop constipation as a result of being the victim of anal penetration.

At the time of trial, A.C. was 14 years old. She testified that defendant had molested her on numerous occasions during 2008. The first time defendant inappropriately touched her, they were on his couch watching TV. He rubbed her vaginal area,[3] both over her clothes and underneath her underwear, and he orally copulated her.

On another occasion, defendant took A.C. with him to a nearby house under the pretext of watching the owner's dogs.[4] Defendant removed his clothes, told A.C. to undress, and orally copulated A.C.

A.C. testified that defendant would touch and lick her vagina every time she came over to his house. She recalled occasions when he orally copulated her while she sat in a chair in his garage. She also testified about several instances of molestation that occurred

---

[3] During examination, A.C. referred to her "V." The prosecutor clarified that this meant her vaginal area.

[4] There was some confusion as to whether defendant's friend or one of defendant's sons owned the house at the time defendant took A.C. there. This issue is not relevant on appeal.

4

on the trampoline in defendant's backyard. Defendant had a "sexual book" that he would show her while they were on the trampoline. He tried to stick his finger inside her anus twice, but she told him to stop because it hurt. Defendant told her that she needed to "relax," and he showed her parts of the book that discussed relaxation. He told her that he had been able to put his finger in her anus the night before when she was sleeping because she had been relaxed. Defendant also touched A.C.'s vagina with his penis and made her touch his penis with her hand.

A.C. drew a picture of defendant's penis for the police during the investigation, and the prosecution introduced the drawing at trial.[5] A.C. included wavy lines on the drawing and wrote the word "rinckuls" (wrinkles) next to the lines. She drew hair underneath the penis and wrote next to it, "brown/black and little bit of w[h]ite/gray hair." According to Dr. Young, when A.C. drew this picture, she was at "Tanner stage 1," which is an early phase of sexual physiological maturity wherein the subject does not yet have pubic hair.

A.C. also testified that "every time" defendant drove her home, he would pull the car to the side of the road and rub her vaginal area. Investigating Detective John Ramos testified that defendant's house was located in a remote, rural area where one could remain unnoticed while parked on the roadside.

---

[5] We requested and reviewed the exhibits in this case.

Defendant often told A.C. to wear "loose" clothing so that it was "easier" for him to reach her vagina. He told her that if she ever told anyone about what they did together he would go to jail and they would not see each other anymore. At the time, A.C. liked being with defendant and did not know that what he was doing to her was "bad." By the time of trial, she understood the nature of defendant's behavior. It took frequent encouragement from counsel for A.C. to elaborate on her testimony because she felt embarrassed and uncomfortable describing the details of the molestation.

2.      *D.J.'s Testimony (prior sex crimes evidence)*

The parties stipulated that in 1988 defendant pled no contest to committing a lewd act, forcible oral copulation, and forcible sexual penetration against his minor stepdaughter, D.J.. At trial, D.J. testified that defendant had raped her in 1987, when she was 12 years old. She and her mother had been living with defendant and, late one night, he came into her room and asked her to help him with his car. D.J. got out of bed and helped defendant push his car to the back of his five-acre property. As she started back to the house, he grabbed her by the throat and told her to undress. She begged him to stop and tried to run away, but he pushed her up against the car and choked her. Fearing for her life, she took off her clothes.

Defendant had a cup in the car that was filled with a cream substance. He removed his clothes and rubbed the cream on her anus and vagina. He penetrated her vagina and anus with his fingers and then with his penis. When she began "bleeding

6

really bad," defendant forced her to orally copulate him. He eventually let D.J. stop and get dressed. He told her that in order to leave, she had to convince him that she would not report what he had done. She promised that she would not tell and defendant took her home.

The next day, she told a friend at school what had happened and that friend's mother called the police.[6]

### 3. *Defendant's Arrest and Attempted Suicide*

As part of the investigation, Detective Ramos arranged for A.C.'s mother to make a pretext call to defendant. During this call, she told defendant that she knew he had been molesting A.C.

Two days later, Detective Ramos and about eight other police officers arrived at defendant's home to execute a search warrant. The officers entered the house, announced their presence, and began searching the house for occupants. Defendant had barricaded himself in the bathroom. When the police forced the door open, they found him inside with severely lacerated wrists. Defendant's injuries were treated at the scene before he

---

[6] The prosecution also sought to introduce the testimony of two women that defendant had sexually assaulted, on separate occasions, in 1972 and 1987. Both women were in their 20's at the time of the assault, and defendant had forced both of them to orally copulate him at knifepoint. The court ruled that this evidence was unduly prejudicial because the crimes were not sufficiently similar to the charged offenses and were too remote in time.

was escorted off his property. Dr. Young reviewed the photographs that police took of defendant's wrists and opined that his injuries were consistent with a suicide attempt.

4. *The Shotgun Evidence*

While searching defendant's house, the police found a shotgun underneath the mattress in the master bedroom. Defendant's wife told Detective Ramos that she had inherited the gun from her grandfather. Before impounding it into evidence, Detective Ramos took photographs of the location and position of the gun as it was found. He also examined the gun and determined that it was an Ithaca, pump-action, 12-gauge shotgun and that "everything functioned like a normal shotgun." He testified that he is familiar with that type of gun because it is similar to a pump-action shotgun issued on the force.

He also testified that, the day before, he had attempted to retrieve the shotgun from the evidence room, only to discover that it had been destroyed. After some research, he learned that it had accidentally been destroyed as a result of his department's property "safekeeping" procedures. He explained that the department's policy is to destroy property in safekeeping not claimed within 90 days. Shortly after defendant's arrest, a man claimed ownership of the shotgun.[7] Detective Ramos authorized the release of the shotgun to this purported owner on the condition that he return with documentation verifying ownership, and the gun's classification was changed from evidence to

---

[7] Outside the presence of the jury, defense counsel informed the court that this individual was defendant's brother-in-law.

8

safekeeping. However, the purported owner never returned and the gun was destroyed after the 90-day period.

The parties stipulated that defendant had previously been convicted of a felony.

5.    *Defense Case*

A friend of defendant's deceased wife (who died in 2009) testified that she was often at defendant's house when A.C. was there. A.C. always appeared to be having a good time and she never refused to get into defendant's car with him. One of defendant's sons testified that when his sons (defendant's grandsons) visited defendant they always had a good time.[8]

During opening and closing statements, defense counsel argued that A.C. was lying about the incidents of molestation. Counsel argued that A.C.'s vagina had been red and irritated because she had poor hygiene as a result of her adoptive parents' neglect.

II

ANALYSIS

1.    *Prior Sex Crimes Evidence*

Defendant argues that D.J.'s sexual abuse testimony was unduly prejudicial. We disagree.

---

[8] It does not appear that this witness is A.C.'s biological father.

The admissibility of uncharged misconduct evidence is committed to the sound discretion of the trial court, and we will not overturn an evidentiary ruling unless it falls " 'outside the bounds of reason.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 714; *People v. Hoyos* (2007) 41 Cal.4th 872, 898.) Evidence Code section 1108 permits the jury to consider evidence of a defendant's prior sexual misconduct to demonstrate a propensity to commit other sexual offenses of the same type. (*People v. Falsetta* (1999) 21 Cal.4th 903, 915, 922; *People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1096.) In order to be admissible, the evidence must have "substantial probative value that is not largely outweighed by its potential for undue prejudice under [Evidence Code] section 352." (*People v. Walker* (2006) 139 Cal.App.4th 782, 806.) The greater the degree of similarity between the charged and uncharged offenses, the higher the uncharged conduct's probative value in proving propensity to commit the charged offenses. (*People v. Branch* (2001) 91 Cal.App.4th 274, 285.)

When an uncharged act is "highly probative," a court should not exclude it "unless the undue prejudice is unusually great." (*People v. Walker*, *supra*, 139 Cal.App.4th at p. 806.) The following factors are relevant when assessing prejudice: "(1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*People v. Daniels* (2009) 176 Cal.App.4th 304, 316.)

In the present case, there were significant similarities between the charged and uncharged molestations. Both victims were minors when the acts occurred; D.J. was 12 and A.C. was 8. The victims were related to defendant, and in both cases, he used his familial role and position of authority to take advantage of the victims. For example, defendant often molested A.C. while they were engaged in activities she enjoyed, such as watching TV or playing on the trampoline. He took advantage of the fact that A.C. liked to spend time at his house by telling her that if she ever told anyone about the touching, she would never see him again. In a similar manner, he used his parental role to get his stepdaughter in a secluded setting with him. D.J. could not have suspected that by helping her stepfather move his car she was imperiling her safety.

Additionally, defendant demonstrated a fixation on penetrating the young victims' vaginal and anal orifices. He tried to get A.C. to "relax" so that he could penetrate her anus. With D.J., he used lubricant to accomplish anal penetration.

Because we find the degree of similarity between the two molestations very high, we conclude that D.J.'s testimony was highly probative of defendant's propensity to commit the charged offenses. And, we do not find the testimony to be particularly prejudicial. D.J.'s examination did not consume a significant amount of trial time, the jury learned that defendant had already been convicted for that incident, and the trial court instructed the jury with CALCRIM No. 1191, which states that evidence of the uncharged conduct "is not sufficient by itself to prove [guilt]."

11

Defendant argues that the molestation of D.J., having taken place 20 years before the molestation of A.C., was too remote to be probative. We disagree. There are "no specific time limits . . . for determining when an uncharged offense is so remote as to be inadmissible" and similarities between the offenses "balance[] out the remoteness." (*People v. Branch*, *supra*, 91 Cal.App.4th at pp. 284-285.)

In *Branch*, evidence of sexual molestation that occurred 30 years before the charged molestation was admissible because the molestation in each case was "remarkably similar." (*People v. Branch*, *supra*, 91 Cal.App.4th at p. 285.) The victim of the uncharged molestation was the defendant's 12-year-old stepdaughter and the victim of the charged molestation was his 12-year-old step great-granddaughter. (*Ibid.*) Additionally, the defendant "took advantage of the fact that each victim was staying in his home when the molestations took place." (*Ibid.*) The similarities in the present case are similarly remarkable and mitigate any effect on probative value caused by temporal remoteness.

We also reject defendant's contention that D.J.'s testimony was unduly inflammatory because, unlike A.C.'s testimony, it involved physical violence and penile penetration. This argument minimizes the severity of his molestation of A.C. We can only assume that the reason defendant did not become physically violent with A.C. was because violence was completely unnecessary due to her young age. Defendant needed to use violence with D.J. because she was old enough to understand the nature of his

12

actions, and therefore fought back. A.C., on the other hand, did not know that what defendant was doing to her was criminal.

We find defendant's manipulation of A.C.'s innocence just as reprehensible as his use of physical force against a slightly older victim who recognized the nature of defendant's advances. Furthermore, Evidence Code section 1108 does not require that the uncharged sexual misconduct be identical to the charged offense. The multitude of similarities between defendant's molestations of D.J. and A.C. is more probative than the few differences. The trial court properly admitted D.J.'s testimony.[9]

Even if defendant could show that admitting the testimony was error, we would not reverse. "We evaluate error in the admission of prior crimes evidence using the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . under which we determine whether it was 'reasonably probable that a result more favorable to defendant would have resulted' had the prior crimes evidence not been admitted." (*People v. Williams* (2009) 170 Cal.App.4th 587, 612 [Fourth Dist., Div Two], quoting *People v. Welch* (1999) 20 Cal.4th 701, 750.) Evidentiary errors are harmless where the strength of the People's case is "overwhelming" compared to the strength of the defense. (*People v. Marks* (2003) 31 Cal.4th 197, 229.)

---

[9] Because we conclude that admission of D.J.'s testimony was not unduly prejudicial under Evidence Code section 352, we reject defendant's argument that the testimony violated his Fourteenth Amendment right to a fair trial by rendering his trial "fundamentally unfair."

It is not reasonably probable defendant would have received a more favorable result if D.J. had not been allowed to testify because the People presented overwhelming evidence that defendant molested A.C., the most compelling of which was A.C.'s uncontradicted testimony about the details of the molestation. In addition, A.C.'s mother had observed redness and irritation in her vaginal area, and Dr. Young observed fissures in her anus that were consistent with sexual abuse. The jury also saw the drawing of defendant's penis that A.C. had made during the investigation. This drawing is compelling evidence she had seen defendant's penis. At eight years old and with no pubic hair of her own, A.C. drew an anatomically accurate picture of a penis with pubic hair, which she identified as multicolored. Finally, even without D.J.'s testimony, the parties stipulated that in 1988 he was convicted of committing several forcible sexual offenses against a minor. In contrast, defendant's theory at trial was that A.C. was lying about the molestation and had poor hygiene due to parental neglect.

2. *Suicide Attempt*

Defendant argues that the admission of evidence of his suicide attempt was prejudicial error. He also asserts that the court erred in refusing to give a limiting instruction that the evidence could not establish guilt on its own.

a. *Background facts*

At the close of evidence, the prosecutor requested CALCRIM No. 372, the standard flight/consciousness-of-guilt instruction, modified to substitute "suicide

14

attempt" for "flight."**10** Defense counsel objected to the use of the instruction. The court

ruled that it would not give a modified flight instruction, but that the prosecutor could

"argue what you want to argue" to the jury regarding the suicide attempt evidence.

During closing argument, the prosecutor argued that defendant's actions

demonstrated consciousness of guilt because he knew as he was cutting his wrists that he

was about to be arrested for molesting A.C. The prosecutor added, "So you can use that

evidence in coming to your conclusion. . . . You have to decide yourself from the

testimony whether or not he was actually trying to commit suicide, okay? That in itself is

not enough to prove guilt by itself."

b. *The evidence was properly admitted*

Defendant asserts that whether a suicide attempt can be admitted as evidence of

consciousness of guilt is "an issue of first impression." He argues that no California law

supports the admission of suicide attempt evidence for such a purpose. He is incorrect.

California law holds that evidence of a defendant's suicide attempt constitutes

circumstantial evidence of guilt if the evidence supports an inference that the suicide was

an attempt to evade prosecution.

---

**10** CALCRIM No. 372 reads: "If the defendant fled [or tried to flee] (immediately after the crime was committed/ [or] after (he/she) was accused of committing the crime), that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant fled [or tried to flee], it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled [or tried to flee] cannot prove guilt by itself."

15

California courts have long recognized that " '[*a*]*ny conduct* of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible.' " (*People v. Butler* (1970) 12 Cal.App.3d 189, 193, quoting *People v. Gryszkiewicz* (1948) 88 Cal.App.2d 230, 235, italics added.)  As the court stated in *People v. James* (1976) 56 Cal.App.3d 876 (*James*), postcrime conduct, including flight, escape from custody, and attempted suicide, "can be said to constitute circumstantial evidence of guilt." (*Id.* at p. 890.)

Before and after *James*, California courts have considered evidence of a defendant's suicide attempt after the alleged commission of a crime to constitute circumstantial evidence of guilt if it supports an inference that the suicide attempt was an effort to evade prosecution.  (See, e.g., *People v. Sorrentino* (1956) 146 Cal.App.2d 149, 161 ["There was also evidence of consciousness of guilt on the part of appellant, since he stated that he would have committed suicide if the officers had not taken his gun"]; *People v. Panah* (2005) 35 Cal.4th 395, 482 [trial court properly excluded evidence of the defendant's suicide attempt *before* the alleged crime, despite the defendant's argument that it was relevant to "negate any inference of consciousness of guilt from [his] suicide attempt . . . the morning *after* the crime"], italics added; *Hall v. Scribner* (N.D. Cal. 2008) 619 F.Supp.2d 823, 845 [the "most dramatic" evidence "suggest[ing] consciousness of guilt . . . was defendant's attempted suicide the day before the [police] interview"].)  The appropriate admissibility inquiry does not focus on the type of

16

postcrime conduct (e.g., flight versus suicide attempt versus escape from custody) but on whether the conduct was designed to evade apprehension. (*James*, *supra*, 56 Cal.App.3d at p. 890.)

Evidence that defendant had cut his wrists while barricading himself in the bathroom as the police entered his home supports an inference that he was trying to evade prosecution for the molestation of A.C. Taken in isolation, evidence that defendant cut his wrists might not constitute circumstantial evidence of guilt; however, the jury heard evidence that supplied meaning to defendant's actions.

Even before the police arrived at defendant's house, he knew that his conduct was revealed. A.C.'s mother had terminated the visits and subsequently confronted him about the molestation during a pretext call. Given that defendant knew A.C. had reported the molestation, the jury could reasonably infer he knew the reason for law enforcement's arrival at his house and was attempting to avoid prosecution through suicide.

Defendant argues that his actions do not necessarily support such an inference. He asserts that he could have been attempting suicide because he knew that "highly prejudicial prior sex crimes evidence [would] almost certainly be admitted at trial . . . [which knowledge] is enough in itself to make someone suicidal." Whether or not this is a reasonable inference to draw from the evidence, such an argument goes to the weight, not the admissibility of the evidence. (See, e.g., *People v. Kimble* (1988) 44 Cal.3d 480, 498.)

Next, he argues that even if the evidence was circumstantial evidence of guilt, it was unduly prejudicial. We disagree. His suicide attempt certainly had no more of a tendency to inflame the jury than D.J.'s or A.C.'s testimony describing the molestation. Conversely, the suicide attempt was highly probative of consciousness of guilt because it occurred after the pretext call and just as the police were entering his home.

c. *Failure to give a limiting instruction was harmless error*

Despite objecting to a limiting instruction at trial, defendant now contends that such an instruction was necessary in order to guide the jury on how to consider the evidence. Specifically, he argues that the court should have instructed that the evidence could not prove guilt by itself. Putting aside defendant's forfeiture of this argument,[11] we conclude that the court's failure to give a limiting instruction, if error, was not prejudicial.

Section 1127c governs situations where the prosecution introduces evidence of a defendant's "flight." This section provides that if the prosecution "relies" on the flight evidence "as tending to show guilt," the court must instruct the jury that such evidence "is not sufficient in itself to establish . . . guilt." (*People v. Tuggles* (2009) 179

---

[11] By failing to request a consciousness-of-guilt instruction, a defendant forfeits any claim of error regarding the instruction. (*People v. Carrington* (2009) 47 Cal.4th 145, 189.)

18

Cal.App.4th 339, 367.)  CALCRIM No. 372, the instruction defendant argues should have been given, contains the same instruction.

While defendant's suicide attempt was not technically a "flight," the prosecutor relied on it during trial for the same purpose, i.e., as tending to show guilt based on evasion of apprehension, and thus the better practice would have been to give the instruction.  Where "certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt. . . . [t]he cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

However, we find that any error was harmless because the prosecutor gave this instruction.  During her closing argument, she told the jury:  "[Defendant's actions] may, and I stress may, show that he was aware of his guilt. . . .  You have to decide yourself from the testimony whether or not he was actually trying to commit suicide, okay?  That in itself is not enough to prove guilt by itself."  Moreover, in cases like this, where the evidence of guilt is "overwhelming," the reviewing court can safely conclude that the trial court's "failure to instruct . . . could not have had any effect upon the jury's ultimate determination." (*People v. Sheldon* (1967) 254 Cal.App.2d 174, 181.)

3.    *The Firearm Conviction*

Defendant makes several arguments as to why his conviction for being a felon in possession of a firearm should be reversed, but we find none of them persuasive.

a.    *Photographs of the gun*

Defendant argues that the court erred in admitting two photographs of the shotgun because they were inadmissible under *Cal. v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and as a substitute for the gun itself.

The due process clause of the Fourteenth Amendment requires law enforcement agencies to preserve exculpatory evidence "that might be expected to play a significant role in the suspect's defense." (*Trombetta*, *supra*, 467 U.S. at pp. 488-489; *People v. Beeler* (1995) 9 Cal.4th 953, 976.)  When, however, evidence is only potentially exculpatory or potentially useful to the defense, the state's failure to preserve the evidence does not violate due process unless the defendant demonstrates that law enforcement acted in bad faith in failing to preserve the evidence.  (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58.)

*Trombetta* does not apply because the shotgun was not exculpatory evidence and the police did not destroy it in bad faith.  The only way the gun would have been exculpatory to defendant's case is if he planned to use the gun to show that it was a replica or otherwise fake.  As the court noted, nobody, including the defense, knew that the gun had been destroyed until Detective Ramos attempted to retrieve it from evidence

20

the day before trial. Defendant had no plans to undertake an expert analysis of the gun at trial or otherwise prove it was fake.

Moreover, the police did not destroy the gun in bad faith. According to Detective Ramos, there was no conscious decision to destroy the gun; it was inadvertently destroyed pursuant to department policy after the purported owner never returned to claim it. We agree with the trial court that this was a "mistake" and that the destruction "can at worst be described as negligent." (*Arizona v. Youngblood*, *supra*, 488 U.S. at p. 58.)

We also reject defendant's argument that the two photographs were inadmissible as substitute evidence for the actual shotgun. He asserts that the photographs lacked foundation because the prosecution "fail[ed] to carry [its] burden of showing the printed representation accurately depicts what it purportedly shows." The photographs were used to demonstrate that the gun was real, Detective Ramos's testimony served that purpose. The photographs were introduced as demonstrative evidence of the position and location of the gun when the police found it.

" 'No photograph or film has any value in the absence of a proper foundation.' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1303.) "The general rule is that a photograph is admissible upon a showing that it accurately depicts what it purportedly shows." (*Ibid.*) "Once properly authenticated and admitted into evidence, a photograph may be

used as demonstrative evidence to support a witness's testimony or as probative evidence of what is shown." (*Id.* at p. 1304.)

The prosecution introduced the photographs when Detective Ramos was describing where his team found the shotgun. Exhibit 11 shows defendant's mattress partially lifted away from the box spring to reveal a shotgun lying on top of the box spring. Exhibit 10 shows the gun lying on top of the box spring once the mattress had been fully removed. In both of these photographs, defendant's bedding is clearly visible but the gun is partially obscured due to poor lighting and the position of the mattress. Detective Ramos testified that he took these photographs immediately after they found the gun and that the photographs accurately depict "the position [in which] the officer found this weapon." Thus, the prosecution demonstrated that the photographs were "an accurate representation of what [they] purported to be," namely, a depiction of the location and placement of the gun as the police had found it. (*People v. Chism*, *supra*, 58 Cal.4th at p. 1304.)

Moreover, assuming it was error to admit the photographs, the error was not prejudicial. It is highly unlikely that the jury regarded two photographs of a partially obscured gun as evidence tending to show the gun was real. The strongest evidence that the gun was real was Detective Ramos's testimony regarding his manipulation and examination of it. The jury would have heard this evidence even if the photographs had been excluded.

b. *Response to jury question*

During deliberations, the jury asked the court "whether the picture of the shotgun is enough evidence or does it need to be presented in court as evidence being that the weapon was destroyed?" The court commented to counsel that the question was "strange" because "the gun would never go back to [the jury] in the first place, even if the gun were here. . . . What they would get is a photograph of the gun." The court proposed to respond with: "Your decision must be based only on the evidence received." Both counsel agreed with this response. Defendant now argues that the response was error. Even if he had not forfeited this argument by agreeing to the response at trial,[12] the argument is without merit.

Section 1138 imposes upon the court a " ' "duty to clear up any instructional confusion expressed by the jury." ' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 355.) A court is not required to elaborate on standard instructions. (*People v. Montero* (2007) 155 Cal.App.4th 1170, 1179.) Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations, if any, to give the jury. (*Ibid.*) We review a trial court's response to a jury question for abuse of discretion. (*People v. Waidla*, *supra*, 22 Cal.4th at pp. 745-746.)

---

[12] A defendant forfeits any claim of error when he or she consents to the court's response to a jury question. (See, e.g., *People v. Tully* (2012) 54 Cal.4th 952, 1056.)

23

In this case, the relevant original instructions were full and complete in themselves. The court provided the jury with the elements of the section 12021, subdivision (a)(1) charge and directed the jury to "impartially compare and consider all the evidence that was received throughout the entire trial." The court also instructed that "[e]vidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else that I told you to consider as evidence." The court's response that the jury must decide whether defendant was guilty of the firearm charge "based only on the evidence received" simply reiterated the complete instruction that the jury had already heard. Because the jury already had all of the instructions necessary to arrive at a verdict, it was not an abuse of discretion to decline to respond any further.

Defendant argues that the court's response amounted to a ruling that the photograph of the shotgun was sufficient evidence to support the firearm conviction. He asserts that the court should have instead responded to the jury's question by instructing that "the photographs of the shotgun were for demonstration purposes only and they were not to be used as probative evidence of the existence of a real shotgun." We disagree. Because the photographs were not admitted and authenticated for the purpose of showing that the shotgun was real, there was no reason for the trial court to give such an instruction.

24

Quoting an instruction given by the trial court in *People v. Wimberly* (1992) 5 Cal.App.4th 773 (*Wimberly*), defendant argues that the court was also required to respond by instructing that "[t]he improper destruction of evidence can support an inference adverse to the prosecution which may be sufficient to raise a reasonable doubt with respect to the [firearm] charge." *Wimberly* involves the appropriate sanctions for destruction of evidence in violation of a court's discovery order, it does not establish that any destruction of evidence requires an adverse inference instruction. Because the present case does not involve sanctions for violation of a discovery order, we do not find the *Wimberly* instruction appropriate, let alone required.

        c.     *Sufficiency of the evidence*

Defendant also contends that there was insufficient evidence to support the firearm conviction. "To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Jurado* (2006) 38 Cal.4th 72, 118.) All conflicts of evidence are resolved in favor of the judgment and all reasonable inferences are drawn in its favor. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) The testimony of a single witness is sufficient to support a conviction, so long as the testimony is not inherently improbable or physically impossible. (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

25

The statutory elements of a violation of section 12021, subdivision (a)(1) are that a person who has previously been convicted of a felony actually or constructively possessed a firearm. (*People v. White* (2014) 223 Cal.App.4th 512, 524 (*White*).) "To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person." (*Ibid.*)

Here, police found the shotgun wedged between the mattress and box spring of the bed in defendant's master bedroom. During her examination, the victim testified that when she spent the night at defendant's house (which was nearly every weekend during the summer of 2008), he slept in the master bedroom with his wife. Police found men's clothing "that would fit [defendant]" on the floor of the bedroom. Detective Ramos testified that he examined the gun and determined that it was real and fully functioning. He based this opinion on his experience with similar shotguns. Because it is reasonable to assume that a homeowner would be aware of and have the right to control a large shotgun located under the mattress of the bed on which he sleeps every night, we conclude that there was sufficient evidence to support the firearm conviction under a constructive possession theory.

Defendant contends that there was no evidence of his knowledge of and right to control the gun. He argues that it belonged to his wife and Detective Ramos never asked defendant "whether [he] slept in the bed where the shotgun was found in the master

bedroom." Whether or not the gun belonged to defendant or his wife or some third party is irrelevant to constructive possession. In order for a jury to find that defendant constructively possessed the gun, it need only find that he knowingly exercised a right to *control* the prohibited item. (*White*, *supra*, 223 Cal.App.4th at p. 524.) This control can be "direct" (the gun belonged to defendant) or "through another person" (the gun belonged to his wife but she kept it under their bed where he could access it). (*Ibid*.) Even without A.C.'s testimony that defendant and his wife slept together in the master bedroom, the jury could reasonably infer that to be the case because defendant was married and lived with his wife, and because the police found men's clothing on the floor in that room.

Defendant's analogy to *People v. Sifuentes* (2011) 195 Cal.App.4th 1410 (*Sifuentes*) is misplaced. In that case, the court reversed defendant's firearm possession conviction because the record contained no evidence that defendant had a right to control the gun. (*Id.* at p. 1420.) The police had found the gun in the motel bed that his fellow gang member was occupying (the defendant was occupying a different bed), and the gang expert had not provided testimony to support an opinion that all gang members freely share guns at any given time. (*Id.* at pp. 1418-1420.) *Sifuentes* is inapplicable to a case where the gun was found in the bed where defendant sleeps every night. If a comparison to the present case is to be drawn, it would be with *People v. Williams*, *supra*, 170 Cal.App.4th 587, where the police searched the defendant's house and found a firearm

27

under a pillow on his bed.  (*Id.* at p. 596.)  The court rejected his argument that his possession conviction should be reversed because there were other occupants in the house who had "greater access" to the gun than he had.  (*Id.* at p. 624.)  The court stated, "[c]onviction is not precluded . . . if the defendant's right to exercise dominion and control over the place where the contraband was located is shared with another. [Citations.]"  (*Id.* at p. 625.)  Even if the gun belonged to defendant's wife, the jury could infer from the fact that the gun was kept in the bed defendant shared with his wife that he had a right to control it.

Defendant also contends there was insufficient evidence that the gun was real because the prosecution impermissibly used photographs as a "substitute for the actual shotgun itself."  As explained *ante*, the prosecution did not introduce the photographs as evidence that the gun was real.  Rather, Detective Ramos testified that he had examined the shotgun's "weight" and "function," and had "opened the breech or the chamber to make sure that it was clear."  In doing so, he observed that "everything functioned like a normal shotgun."  Because the department issues officers "a similar design pump-action shotgun," he was able to determine that the gun was a "fully functioning" Itahaca "pump-action 12-gauge shotgun."  On its own, this testimony is substantial evidence to support a finding that the gun was real.  (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514 ["a single witness may establish any fact"], citing Evid. Code, § 411; *People v. Elliott*, *supra*,

53 Cal.4th 535, 585 ["the testimony of a single witness is sufficient to support a conviction"].)

### 4.  *Prosecutorial Misconduct*

Defendant claims the prosecutor committed misconduct in the following portion of her rebuttal closing argument:  "[Defense counsel] just talked to you about proof beyond a reasonable doubt, and that's CALCRIM [No.] 220.  Feel free to read it, look at it, analyze it, digest it.  [¶]  Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.  [¶]  So reasonable doubt comes into play only if you have a doubt.  If you don't have a doubt that he did it, then you don't have to worry about reasonable doubt.  Vote guilty.  [¶]  If you have a doubt, then examine all of the evidence, all of the testimony.  We don't have to prove that it's beyond every possible doubt.  It's a reasonable doubt.  [¶]  So is it possible that [I go] home and on the weekend [am] a jockey?  Well, maybe.  Is it probable?  No.  Is it reasonable?  No.  Look at me, okay?  I'm, like, 5 foot 4.  Don't tell anybody but I'm fat; right?  Jockies [*sic*] are tiny people.  I'm not a tiny person.  So is it reasonable that I go home on the weekends and I'm a jockey for racehorses?  No.  That's what we're talking about."

29

Defendant asserts that the prosecutor "completely eliminate[ed]" the reasonable doubt standard by telling the jury that it did not "have to worry about reasonable doubt." He also asserts that her jockey comment impermissibly "trivialized" the reasonable doubt standard by comparing it to "the process of decision making in the ordinary affairs of life."

"[A]s a general matter a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition." (*People v. Ledesma* (2006) 39 Cal.4th 641, 740.) Defendant forfeited his claim of prosecutorial misconduct by failing to object during trial and give the court an opportunity to correct any errors. However, even if he had preserved the issue, we would not reverse.

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).) Reviewing courts " 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*Ibid.*) As a general rule, an explanation of the reasonable doubt standard is improper if it "attempt[s] to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation]." (*Centeno*, *supra*, at p. 666.)

30

We find nothing in the prosecutor's statement quoted above that a jury could interpret as an attempt to eliminate or lessen the prosecution's burden of proof. Just before making the quoted statement, the prosecutor directed the jury to read CALCRIM No. 220, the instruction on the reasonable doubt standard, and "digest it." She stated, "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt."

This description of the reasonable doubt standard is virtually identical to the definition that is codified in section 1096.[13] She then stated that if the jury had *no doubt* that defendant was guilty, "then you don't have to worry about reasonable doubt. Vote guilty." Defendant focuses on the words "then you don't have to worry about reasonable doubt," which, standing alone, would be improper. However, we refuse to separate those words from the clause that precedes them. The prosecutor's full sentence is a logical corollary of section 1096, which authorizes a jury to find a defendant guilty if it has an "abiding conviction of the truth of the charge." It does not lessen the prosecution's

---

[13] Section 1096 defines reasonable doubt as: "[N]ot a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

31

burden of proof to state that a jury may also find a defendant guilty if it has no doubt, i.e., a conviction even stronger than an "abiding" one.

Defendant's analogy to *People v. Lloyd* (2015) 236 Cal.App.4th 49 is inapt. In that case, the prosecutor made several "misstatement[s] of the law" during her closing argument, such as telling the jury that, if it voted not guilty, it had decided that defendant had not committed the crime. (*Id.* at p. 62.) We find no misstatement of the law in the prosecutor's argument. Rather, her comment is similar to the prosecutor's comment in *People v. Romero* (2008) 44 Cal.4th 386 that the jury must " 'decide what is reasonable to believe versus unreasonable to believe' " and to " 'accept the reasonable and reject the unreasonable.' " (*Id.* at p. 416.) The *Romero* court approved the comment because "[n]othing in [it] . . . lessened the prosecution's burden of proof. The prosecution must prove the case beyond a reasonable doubt, not beyond an *unreasonable doubt*." (*Ibid.*, italics added.) The prosecutor here was making a similar point, namely, that she was not required to prove the case beyond any and all doubt.

Turning to the jockey comment, we do not find that it trivialized the reasonable doubt standard "by equating it with exercising judgment in the everyday affairs of life." Defendant compares the comment to the improper comments in *People v. Nguyen* (1995) 40 Cal.App.4th 28. In that case, the prosecutor argued that the reasonable doubt standard "[is] a very reachable standard that you use every day in your lives . . . [such as] when you change lanes as you're driving. If you have a reasonable doubt that you're going to

32

get in a car accident, you don't change lanes." (*Id.* at p. 35.) The appellate court concluded that the prosecutor had trivialized the reasonable doubt standard by implying "that people apply a reasonable doubt standard 'every day' and that [reasonable doubt] is the same standard people customarily use in deciding whether to change lanes." (*Id.* at p. 36.)

The prosecutor in the present case did not make such an implication. By our reading, she intended to illustrate the concept of reasonableness by arguing that it would be unreasonable for a juror to infer from her physical appearance that she moonlights as a jockey. We do not interpret her comment as belittling a juror's responsibility to determine guilt in a criminal trial.

Defendant's comparison of the jockey comment to the illustrations of reasonable doubt in *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, *People v. Otero* (2012) 210 Cal.App.4th 865, and *Centeno*, *supra*, 60 Cal.4th 659 is even more off base. Those cases deal with a prosecutor's use of "an iconic image like the shape of California or the Statue of Liberty . . . to demonstrate the process of proving guilt beyond a reasonable doubt" in a way that "trivialize[s] the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion." (*Centeno*, *supra*, at p. 669.) In each case, the prosecutor's use of an incomplete or slightly inaccurate iconic image left "the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence." (*People v. Otero*, *supra*, at p. 872.) The jockey comment did

not imply that the reasonable doubt standard can be quantified or that guilt can be determined by considering less than all of the evidence.

Most importantly, however, defendant cannot show that he was prejudiced by the prosecutor's comments. " 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' [Citation.]" (*Centeno*, *supra*, 60 Cal.4th at p. 676, quoting *People v. Osband* (1996) 13 Cal.4th 622, 717.) The court instructed the jury on the reasonable doubt standard (CALCRIM No. 220) and provided CALCRIM No. 200, which states that when an attorney's comments on the law conflict with the court's instructions, the jury must follow the court's instructions. Thus, even if the complained-of statements lessened the prosecutor's burden of proof in any way, we presume the jury followed the court's instructions and applied the reasonable doubt standard.

Finally, we reject defendant's argument that the prosecutor's comments amounted to structural error, which requires "reversal per se." Unlike the cases he relies on for support, *Sullivan v. Louisiana* (1993) 508 U.S. 275 and *People v. Johnson* (2004) 119 Cal.App.4th 976, we are not dealing with statements "made by the trial court under the cloak of its authority." (*People v. Katzenberger*, *supra*, 178 Cal.App.4th at p. 1268.) We are dealing with statements by a prosecutor, which are reviewed for prejudice. (*Ibid.*)

5.      *Ineffective Assistance of Counsel*

In his briefs and in an accompanying petition for writ of habeas corpus (case No. E062716), defendant argues that his attorney rendered ineffective assistance by failing to object to the admission of the suicide attempt evidence, to the admission of the photographs of the shotgun, and to the prosecutor's comments during closing argument.[14]

To succeed on an ineffective assistance of counsel claim, defendant must not only demonstrate that counsel's performance fell below an objective standard of reasonableness but he must also demonstrate that counsel's errors were prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-695; *People v. Bolin* (1998) 18 Cal. 4th 297, 333.)  Because we have concluded that none of the alleged errors constituted reversible error, defendant was not deprived of his right to effective assistance of counsel.[15]

---

[14] The writ petition includes a declaration by appellate counsel stating that trial counsel did not respond to his letter seeking explanation for her failure to object to the alleged errors and thereby preserve them for appeal.

[15] We dispose of the writ by way of a separate order.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

HOLLENHORST

J.

36